NO. 07-01-0260-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL E

MAY 13, 2003
_____

IN THE INTEREST OF P.E.W., II, K.M.W., AND D.L.W., CHILDREN
_____

FROM THE 46th DISTRICT COURT OF WILBARGER COUNTY;

NO. 21,957; HON. TOM NEELY, PRESIDING
_____

*Opinion*
_____

Before QUINN and REAVIS, JJ., and BOYD, S.J.[1]

Caren Wininger (Caren) appeals from an order terminating the parental relationship between her and her three children, P.E.W., II, K.M.W., and D.L.W.[2] The children were seven years old and under at the time. Through three issues, she asserts that the 1) evidence was legally and factually insufficient to support the termination order and 2) trial court erred in allowing into evidence hearsay statements made by the children. We affirm the order of termination.

---

[1]John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment. Tex. Gov't Code Ann. §75.002(a)(1) (Vernon Supp. 2003).

[2]The parental rights of the father were also terminated, but that termination has not been challenged on appeal.

## Background

The children made subject to the termination order were those born to Caren and her ex-husband Paul Wininger, Sr. (Paul, Sr.). These were not her only children, however, for she had another with a prior husband. Her prior husband had custody of that child, and Caren was entitled to see him only during supervised visits. This situation arose after the child returned from a visit with Caren and Paul, Sr. During that visit it was determined that the child was sexually molested. Who molested the child was not determined. So, thereafter, Caren's visitation had to be supervised.

The allegations of sexual molestation were not limited to the child of her previous marriage, however. Paul, Sr. eventually pled guilty to criminal charges involving the sexual molestation of one of the three children made subject to the termination order now at issue. Thereafter, he voluntarily relinquished his parental rights to P.E.W., K.M.W., and D.L.W.

Unlike her husband, Caren fought the attempt by the State to terminate her parental relationship with the children. Nevertheless, her efforts were unsuccessful. The trial court found that termination was warranted because she 1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children, *see* TEX. FAM. CODE ANN. §161.001(1)(D) (Vernon Supp. 2003) (stating this to be a ground warranting termination), 2) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children, *see id.* at §161.001(E)

2

(stating the same), and 3) failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the children. *See id.* at §161.001(O) (stating the same). So too did it conclude that termination would be in the best interests of the children. *See id.* at §161.001(2) (stating that termination must also be in the best interests of the children). Thus, it entered an order terminating her parental relationship with the children.

### *Issue Three — Admissibility of the Children's Hearsay Statements*

We initially address issue three since it affects the nature of the evidence we can consider when assessing the other issues. Via that issue, Caren argues that the trial court erred in admitting "hearsay statements by [her] children because such statements were not supported by 'sufficient indications of the statement's reliability.'" We overrule the issue.

*Standard of Review*

Whether the trial court erred in admitting evidence depends upon whether it abused its discretion. *In re K.S.,* 76 S.W.3d 36, 42 (Tex. App.--Amarillo 2002, no pet.). Furthermore, it abuses its discretion when the decision fails to comport with controlling rules and principles, *id.,* or when the decision lacks evidentiary support in the record. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998). Yet, should an evidentiary ruling constitute an abuse of discretion, the case will not be reversed unless the error is harmful, that is, unless it probably caused the rendition of an improper judgment. *Id; see* TEX. R. APP. P. 44.1(a); *see also Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex.1989). This normally obligates the complainant to show that the

3

judgment turned on the particular evidence excluded or admitted. *In re K.S.*, 76 S.W.3d at 42.

Next, hearsay statements of a child 12 and under describing alleged abuse of the child are admissible in a suit affecting the parent/child relationship under certain circumstances. Among other things, the trial court must find that the time, content, and circumstances of the statements provide sufficient indications of reliability. TEX. FAM. CODE ANN. §104.006 (Vernon 2002).[3]

*Application of Standard*

First, Caren never describes, with particularity, the specific testimony she deemed objectionable. Instead, she simply states that the "trial court allowed Mrs. Flores and Ms. Griffin to say what [P.E.W.] told them and Ms. Ackley to say what [K.M.W.] told her." It is not our duty to search the reporter's record for evidence which may fall within the issue before us. *Most Worshipful Prince Hall Grand Lodge v. Jackson*, 732 S.W.2d 407, 412 (Tex. App.--Dallas 1987, writ ref'd n.r.e.); *see Rendleman v. Clarke*, 909 S.W.2d 56, 58 (Tex. App.--Houston [14th Dist.] 1995, writ dism'd) (stating that an appellate court has no duty to search a voluminous record without guidance from the appellant to determine whether an assertion of reversible error is valid). Because Caren, when explaining her issue, neither cited us to the particular evidence which she considered hearsay nor otherwise referenced the comments, she did not preserve her complaint about same. [4]

---

[3]At least one views this statute to be the civil corollary to art. 38.072 of the Texas Code of Criminal Procedure. *See e.g., In re K.L.*, 91 S.W.3d 1, 16 (Tex. App.--Fort Worth 2002, pet. filed).

[4]Alternatively, in stating that the "trial court allowed Mrs. Flores and Ms. Griffin to say what [P.E.W.] told them and Ms. Ackley to say what [K.M.W.] told her," one could reasonably say that Caren demarcated the testimony that she thought inadmissible. That testimony consisted of the reiteration by Flores, Griffin, and Ackley of the comments by P.E.W. and K.M.W. Yet, a fourth individual, Cheryl Polly, appeared as a

4

Second, assuming *arguendo* that 1) the issue had been preserved and 2) the evidence in question was that uttered by P.E.W. and K.M.W. describing Caren's own sexual molestation of the children and her knowledge of that committed by Paul Sr., we would nevertheless conclude that the trial court did not reversibly err in admitting it. With regard to that of P.E.W., the child stated that he knew the difference between truth and lies. One "get[s] busted" and sent to his room when he lies, according to the boy. So too did he state that one does not "get busted" when telling the truth, that he knew how to tell the truth, and that the truth is when "[y]ou don't lie anymore."

Also of note is the evidence indicating that many of P.E.W.'s statements regarding the sexual abuse he suffered were volunteered, while some resulted from questioning. Additionally, Caren admitted that a child of his age would not normally know about the matters he described. Indeed, it is quite difficult to believe that P.E.W., a five year old at the time, had the mental ability to fabricate the explanation he gave his foster mother for masturbating. According to the child, "when mom plays with it, it feels good and it tickles . . . [w]hy can't I do it?" The boy also said that "it tickled" when his mother "sucked on his pee-pee . . . ." Given this and the absence of argument by Caren that the foster mother schooled the child's comments, it is reasonable to deduce that he could describe the acts involved because he experienced them first hand.

witness and also related to the jury comments she heard from those two children. And, her name goes unmentioned in the litany of individuals who the trial court improperly allowed to testify improperly; again, Caren only mentioned Flores, Griffin and Ackley. Given that 1) much of what Polly reiterated also involved Caren's sexual abuse of the children and her knowledge of that committed by Paul Sr. and 2) Caren failed to include Polly in the group of witnesses whom she believed testified improperly, we do not see how Caren was harmed by the admission of the testimony by Flores, Griffin, and Ackerly. *In re J.F.C.,* 96 S.W.3d 256, 285 (Tex. 2002).

5

Next, various of the acts described by the boy were corroborated by other evidence. For instance, P.E.W. disclosed to a counselor how once his father sodomized him while sitting on a bed. The youth tried to "scoot away . . . [but] his father would grab him by the butt and bring him back to him." This same event was also described by K.M.W. when she independently spoke to the counselor. Furthermore, K.M.W. stated that she and Caren "were screaming and father would not let him go." While it may be that K.M.W. was also of tender years, the similarity of the versions uttered by these children suggests that the assault was more than a mere fabrication. Moreover, Caren later admitted, in court, that she believed what her children were saying, at least with regard to what Paul Sr. did to them. Medical examination of P.E.W. provided physical corroboration of his utterances as well. His anal sphincter had been stretched. This was indicative of the child being sodomized, according to the witness. Admittedly, the foregoing entails acts done to P.E.W. by his father. Yet, to the extent those acts were corroborated by other matter (including Caren's own concession alluded to above), it is some evidence of the boy's reliability when speaking about the abuse he experienced at the hands of his mother. Much like the situation involving confidential informants, the reliability of their representations in the past reflects on the reliability of the truthfulness of their present statements. *See Carmouche v. State,* 10 S.W.3d 323, 328 (Tex. Crim. App. 2000). That P.E.W.'s statements can be deemed reliable (even by his mother) when describing the acts committed by his father is an indicia weighing in favor of concluding that his statements were equally reliable when describing the sexual abuse committed by his mother.

6

Next, nothing of record indicates that P.E.W. had a motive to lie or fabricate when describing the abuse he underwent; another factor Caren concedes. So too did Caren have the opportunity to do that which P.E.W. said she did since he was in her custody most all the time.

In short, there appears of record evidence touching upon various indicia which courts often use to assess the reliability of a child's outcry. *See Norris v. State*, 788 S.W.2d 65 (Tex. App.--Dallas 1990, pet. ref'd) (describing those indicia); *Idaho v. Wright*, 497 U.S. 805, 821, 110 S.Ct. 3139, 3150, 111 L.Ed.2d 638, 656 (1990) (describing like indicia). More importantly, comparing those indicia to the evidence at bar provides basis favorably supporting the trial court's conclusion that P.E.W.'s statements regarding the misconduct of his mother were indeed reliable. Thus, it did not abuse its discretion in admitting them.[5]

### Issue One - Sufficiency of the Evidence

Under her first point, Caren asserts that there was insufficient "evidence to clearly and convincingly establish that [she] had done or failed to do any of the activities listed in V.T.C.A. Family Code §161.001(1)." We overrule the point.

---

[5]Given our holding *viz* the utterances of P.E.W., we need not address those of K.M.W. Many were cumulative of P.E.W.'s and none were any more damaging than his. So, to the extent that the trial court correctly allowed the admission of his, we can see no harm in allowing the admission of hers assuming they were not admissible. The factfinder need not have held that Caren sexually molested each child before it could terminate her parental rights to each. It had basis to do so simply by finding that she molested one or was aware of Paul Sr.'s molestation of one and kept him in that environment. *Lucas v. Texas Dept. of Protective and Regulatory Servs.,* 949 S.W.2d 500, 503 (Tex. App.--Waco 1997, pet. denied). In short, we cannot say, after perusing the entire record, that the judgment turned upon K.M.W.'s statements or that there exists any probability that the judgment would have differed had K.M.W.'s statements been excluded. *In re K.S.,* 76 S.W.3d 36, 42 (Tex. App.--Amarillo 2002, no pet.) (stating this to be the test for assessing harm).

7

*Standard of Review*

The standard of review applicable to claims of legal insufficiency is discussed in *Leitch v. Hornsby*, 935 S.W.2d 114 (Tex. 1996), and need not be reiterated. That applicable to claims of factual insufficiency is discussed in *In re C.H.*, 89 S.W.3d 17 (Tex. 2002). The latter standard is met if the evidence enables a reasonable jury to form a firm belief or conviction that grounds existed for termination under the Texas Family Code. *Id.* at 18-19.

Though the trial court found several statutory grounds warranting termination of the parent/child relationship, we need not determine whether each enjoys the requisite amount of evidentiary support. Instead, the decision may be affirmed if the evidence supports the existence of one ground, *In re S.F.*, 32 S.W.3d 318, 320 (Tex. App.--San Antonio 2000, no pet.), assuming the State also proves that termination was in the best interest of the child. *See* TEX. FAM. CODE ANN. §161.001(1) & (2) (Vernon 2002) (stating that termination may be ordered if the trial court finds, by clear and convincing evidence, the existence of a statutory ground and that termination is in the best interests of the child).

Next, the parent/child relationship may be terminated if the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE ANN. §161.001(1)(D) (Vernon Supp. 2003). The term "endanger" contemplates more than a threat of metaphysical injury or the possible ill effect of less than an ideal family life. *In re A.P.*, 42 S.W.3d 248, 259 (Tex. App.--Waco 2001, no pet.). Yet, it does not require proof

8

of actual injury to the child, *id.*, or even a concrete threat of injury. *Texas Dept. of Human Services v. Boyds*, 727 S.W.2d 531, 533 (Tex. 1987). For instance, a child's exposure to continually unsanitary living conditions, his continued uncleanliness, his medical needs and lack of attention thereto, and his subjection to physically abusive parents are indicia which may prove endangerment. *See e.g., In re A.P.*, 42 S.W.3d at 257; *Phillips v. Texas Dept. Protective and Regulatory Serv.*, 25 S.W.3d 348, 354-55 (Tex. App.--Austin 2000, no pet.); *see also In re Tidwell,* 35 S.W.3d 115, 117 (Tex. App.--Texarkana 2000, no pet.). He need not develop or succumb to a malady due to those conditions before it can be said that endangerment arises. It is enough if the youth is exposed to loss or injury or his physical or emotional well-being is jeopardized. *In re M.J.M.L.*, 31 S.W.3d 347, 350-51 (Tex.App.–San Antonio 2000, pet. denied).

*Application of Standard — §161.001(1)(D)*

The evidence of record depicts that P.E.W., K.M.W., and D.L.W. lived in squalid conditions. Witnesses described the home as "filthy." The floors were dirty, and a witness stated that she saw onions sprouting on the carpet. So too were cockroaches seen throughout the house. Indeed, one described how they even crawled in and about baby bottles. Dirty dishes also were seen sitting in a water-filled sink. Food was seen on the floor, as were food containers lying about the kitchen. A caseworker also noted that the toilet did not work and remained unflushed. Apparently, family members had to pour water into the bowl to cause it to cycle. So too did the home smell horribly, lack running water at times, and have "walls [that were] kind of falling down."

9

As one caseworker testified:

> Well, it was certainly not a very safe environment for the children. It was extremely cluttered and it wasn't just a few things laying around. I mean there was a lot of objects on the floor, on furniture. The floors were extremely soiled. Part of the ceiling was trying to — was caving in and falling down; boxes piled everywhere. There was some — lots of trash. It was just very, very filthy and had an odor to it . . . [a] trashy odor, kind of an animal feces or urine kind of odor.

Outside the home, boards with rusty nails could be seen strewn about. "There was just old tires and buckets, broken glass, boards, high weeds." A bathtub lay outside turned upside down. "There was a stove out there," as well as an old trailer in "poor condition" and surrounded by weeds, "real high up to it." Indeed, the housing conditions and Caren's cleaning skills purportedly were so deficient that Paul Sr. threatened to take the kids and leave. Moreover, K.M.W. suffered a cut requiring ten stitches as a result of coming into contact with a nail in a closet.

Admittedly, effort was made to clean the environment. For instance, the State paid an exterminator to kill the roaches, and that condition improved. Also, a neighbor helped Caren clean the house on one occasion. On another occasion, a caseworker offered Caren various resources to help her "fix this house up." They included "concrete services, cleaning services, things like that that would help her if she needed things like this . . . ." She also offered to help Caren find volunteers to help. Yet, Caren "would always say, no, she could do it herself; she just needed time." And, though the condition of the house

would improve somewhat after the State confronted her, it continually regressed to its filthy state.[6]

Next, the uncleanliness experienced was not restricted to the home. The children were also seen wearing dirty clothing. The hands of the youngest were found, by one caseworker, to be black after the child crawled across the floor. Others noticed that the children's diapers were soaked with urine and all of the children had diaper rash. One child's rash was so severe that the witness saw skin peeling away. Yet, Caren testified that she would treat the rash, and it would eventually heal.

That Paul Sr. exhibited violent tendencies also appears of record. He struck P.E.W. in the face, causing him to suffer two black eyes. He did this out of anger, according to Caren. Paul Sr. also struck his wife, as evinced by bruising on her body. And, that Paul Sr. sexually abused P.E.W. and K.M.W. is undisputed. Though Caren professed ignorance of this, she nevertheless admitted that he had once asked her permission to "poke" K.M.W., a female child of three years. When Caren asked what he meant, he replied: "you know, like I poke you." Another time, Caren saw K.M.W. straddling Paul Sr. as he lay on the bed. Paul Sr. had an erection, and K.M.W. said "mommy, daddy's poking my pee-pee with his pee-pee." As stated by Caren, she suspected Paul was molesting the children, "but [had] no proof" despite the foregoing incidents. Yet, we are told of no effort

---

[6]Of course, Caren initially denied the testimony describing her house as filthy. Yet, she eventually conceded that while it may not have been a safety hazard in her view, it was nevertheless in "bad shape" and not "what it should be." Furthermore, effort was made to minimize (on appeal) the condition of her house by stating that "Donna Reed she may not be." Being a good parent does not require one to act like the fictional television characters portrayed by Donna Reed, June Cleaver, and the like. Nor does it permit them to maintain their offspring in a non-fictional setting of squalor, decay, and vermin.

11

on the part of Caren to verify or disprove her suspicions. Indeed, she said, at one time, that she continued to believe Paul Sr. was innocent even after he pled guilty to the criminal charges levied against him. And, though she eventually mentioned her suspicions to a caseworker, she waited several months after witnessing the K.M.W./Paul Sr. incident to do so. On the other hand, the outcry of P.E.W. illustrated how Caren would play with and suck on his penis and how she allowed him to touch her breasts.

Finally, the record illustrates that P.E.W. suffered from belated educational development while in the custody of Caren. Though five years old before his removal from the house, he "never had any education at all . . . ." He did not know basic things like "ABCs, one, two, three . . . ." "He didn't know his colors . .. how to spell his name . . . anything." Nor did K.M.W. "[k]now her numbers, [or] her colors." Furthermore, those to whom she spoke "had to really listen to see what she was saying." Since being placed with foster parents, both children have learned many of those tasks. According to her foster parent, K.M.W. is now "doing excellent."

The foregoing constitutes ample evidence entitling a reasonable jury to form a firm belief or conviction that Caren knowingly placed or knowingly allowed her children to remain in conditions or surroundings which endangered their physical or emotional well-being. Admittedly, she belittled or contradicted much of the testimony and evidence harming her. Yet, the factfinder had the right to select who to believe, and we cannot say it erred in opting to disbelieve her. In sum, the State proved at least one statutory ground

12

authorizing termination of Caren's parental rights, and because it did, we need not determine if it proved others.

### *Issue Two — Best Interests of the Children*

Through her second issue, Caren asks whether there existed "evidence to clearly and convincingly establish that termination . . . [was] in the best interest of her children?" We answer yes.

*Standard of Review*

The applicable standards of review were discussed in the preceding issue. We refer the litigants to it. We further note that much of the evidence establishing a statutory ground for termination may also evince that the best interests of the child warrant termination. *In re C.H.*, 89 S.W.3d at 28. As acknowledged by the Supreme Court, "the same evidence may be probative of both issues." *Id.* Also of note are the indicia which have become known as the *Holley* factors. Espoused in *Holley v. Adams*, 544 S.W.2d 367 (Tex. 1976), they were considered helpful by that court in assessing the child's best interests. Included among them are: 1) the desires of the child; 2) the emotional and physical needs of the child now and in the future; 3) the emotional and physical danger to the child now and in the future; 4) the parental abilities of the individuals seeking custody;

13

5) the programs available to assist these individuals to promote the best interest of the child; 6) the plans for the child by these individuals or by the agency seeking custody; 7) the stability of the home or proposed placement; 8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and, 9) any excuse for the acts or omissions of the parent. Though helpful in assessing the situation, one need not prove that each *Holley* factor favors termination, however. Again, all the State need do is present enough evidence from which the factfinder can reasonably form a firm conviction or belief that the child's best interests warrant termination.

*Application of Standard*

In the mix, we include all the evidence described under issue one. We further note that a caseworker and the children's counselor testified that termination would be in the best interests of the children. That would facilitate their need to feel safe and secure. Moreover, since leaving the control of Caren, the children have matured academically, physically, and to some extent emotionally. Also appearing of record is evidence that Caren was unable to take immediate control of her offspring if she were to regain possession of them. She had no job at the time of trial, was unable to pay her bills, had her utilities disconnected, and moved in with another family. Additionally, the abode of the family with which she was living was too small to accommodate three more children; thus,

14

she conceded that she could not take possession of the children until she sold her old home.

Other evidence indicates that though she gave Paul Sr. money while he was in jail, she provided her children with no financial support once they were removed. Also, K.M.W. and D.L.W. had bonded well with their foster parents, who wished to adopt them. So too had P.E.W. bonded well with his.

Next, the State made counseling accessible to Caren. Yet, she attended sporadically and appeared concerned only with her problems, not with improving her relationship with her children. Nor had she "accepted responsibility for the abuse and neglect of her children." "She hasn't been able to provide a safe home and environment," according to one caseworker. This worker also opined that Caren was not appropriate with her children during visits, that "she was very negative toward" them, that she yelled and constantly criticized P.E.W. and ignored K.M.W.

The foregoing constitutes ample evidence enabling a reasonable jury to form a firm belief or conviction that termination of the parent/child relationship was in the best interests of the child. Thus, we overrule issue two.

Accordingly, we affirm the final order terminating the parent/child relationship here involved.

Brian Quinn
Justice

15