COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-07-163-CV

 

 

IN THE INTEREST OF M.R.

AND
W.M., CHILDREN

                                                                                                        

 

                                              ------------

 

           FROM
THE 323RD DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------

Introduction








Appellant Erica D. (Mother)
appeals the trial court=s order
terminating her parental rights to her two children, M.R. and W.M.  Appellant W.P.M. appeals the termination of
his parental rights to his son, W.M.  In
three issues, Mother argues that the evidence was legally and factually
insufficient to support the trial court=s endangerment findings and factually insufficient to support its best
interest findings as to both children. 
In ten issues, W.P.M. contends that the trial court erroneously admitted
M.R.=s outcry statements and that the evidence was factually insufficient
to support the trial court=s endangerment findings and best interest findings as to W.M.[1]  Because we hold that the evidence was both
legally and factually sufficient to support the trial court=s endangerment findings, factually sufficient to support the best
interest findings, and that the outcry evidence was properly admitted, we
affirm.

Background Facts

On April 16, 2006, Child
Protective Services (CPS) received a referral that drug use was occurring in
apartment 120, on Las Vegas Trail in Fort Worth, Texas.  CPS believed that Mother and her children,
seven-year-old M.R. and three-year-old W.M., were staying in that apartment
with Mother=s parents,
her brother, her brother=s
girlfriend, and their baby.  CPS
investigator Jeannie Maxie went to the apartment, but neither Mother nor the
children were there.  Maxie asked the
family members to take a drug test, but they refused.  Maxie made several attempts to locate Mother
at that address and at the Sonic where she worked, but she was unsuccessful in
finding Mother.  At one point, Maxie
spoke to Mother on the phone and they set up an appointment to meet, but Mother
did not show.  Mother made no attempts to
contact CPS.








On June 4, 2006, CPS received
another referral that M.R. was wandering 
outside alone in front of a Motel 6.[2]  On June 8, 2006, CPS  removed M.R. and W.M. from Mother=s custody under a court=s Order for Protection of Child in Emergency.  Neither father was available to take the
children.  M.R.=s biological father was living in Oklahoma, and  W.P.M. was incarcerated at the time of the
second referral and the removal.








On June 26, 2006, CPS placed
both children in foster care.  While the
children were in foster care, Mother repeatedly refused to follow her CPS
service plan.  For example, Mother
refused to attend parenting classes or counseling sessions.  Additionally, W.P.M. did not contact W.M.=s caseworker to inquire about W.M.=s well-being although W.P.M. did testify that he asked his family and
Mother=s friends for information about his son.  M.R.=s father, Michael, attended the contested show cause hearing on June
29, 2006, and provided a potential relative placement for M.R.  He did not show up for a scheduled visit in
November, but he later contacted CPS in January 2007 and claimed that he could
not make the scheduled visit because he had been in rehab again.  He did ask about M.R. and CPS attempted to
mail him a service plan, but the plan was returned.  Michael did not make any further contact with
M.R. or with CPS.  

At trial, the foster mother
testified about outcry statements made to her by M.R.  The foster mother stated that one morning
while she was fixing M.R.=s hair and
M.R. was brushing her teeth, M.R. was talking about how cute W.M. was as a baby
and that Amommy
started using drugs@ about that
time.  The foster mother testified that
M.R. talked about Awhen mommy
started smoking@ and
described the pipe and Athat smoke
came out of the top of it.@  M.R. also told the foster mother
Athat other people were doing drugs with mom@ and named W.P.M., her aunt, uncle, and grandparents.  Additionally, the foster mother testified
that M.R. talked about how people Awould all come over and go into a room and smoke the Merry Wonka and
she would be left in charge of [W.M.]@ and two other babies.  The
foster mother also testified concerning other statements that M.R. made, such
as how they found their food in dumpsters, drove around at two in the morning
looking for a place to sleep, and received spankings with belts from W.P.M.  M.R. did not testify at trial, although,
according to CPS, the child was available to testify.

On May 10, 2007, after a
three-day bench trial, the trial court terminated Mother=s parental rights to M.R. and W.M. and W.P.M.=s parental rights to W.M.








Admissibility of Child=s Statement

In W.P.M.=s first issue, he argues that the trial court erroneously admitted
M.R.=s outcry statements because they were not reliable.  Specifically, he Acontends that the time, content, and circumstances of the statement[s]
do not provide sufficient indications of [their] reliability.@

In 1997, the Legislature
amended the family code to permit the admission of hearsay statements by child
victims in termination of parental rights proceedings.  In re K.L., 91 S.W.3d 1, 15 (Tex. App.CFort Worth 2002, no pet.).  Section 104.006 of the Texas Family Code
permits the trial court to admit a child=s statement of abuse if it finds that the statement is reliable and
(1) the child testifies or is available to testify at the proceeding in court
or in any other manner provided for by law or (2) the court determines that the
use of the statement in lieu of the child=s testimony is necessary to protect the welfare of the child.  See Tex.
Fam. Code Ann. ' 104.006
(Vernon 2002); In re S.B. and Y.B., 207 S.W.3d 877, 883 (Tex. App.CFort Worth 2006, no pet.).  The term Aabuse@ as defined
in Section 261.001 of the family code includes the following:

(A) mental or emotional injury to a child that
results in an observable and material impairment in the child=s
growth, development, or psychological functioning; 








(B) causing or permitting the child to be in a situation in which the
child sustains a mental or emotional injury that results in an observable and
material impairment in the child=s growth, development, or
psychological functioning; . . .

(I) the current use by a person of a controlled substance as defined
in Chapter 481, Health and Safety Code, in a manner or to the extent that the
use results in physical, mental, or emotional injury to a child.

 

Tex.
Fam. Code Ann. ' 261.001(1)(A)-(B), (I) (Vernon Supp. 2007).  Thus, we conclude that M.R.=s testimony falls within the family code=s definition of abuse for purposes of section 104.006.

Only a few
cases address the reliability of a child=s outcry under section 104.006. 
This court has previously discussed section 104.006 of the family code
in In re K.L.  91 S.W.3d at
17.  In that case, five witnesses,
including three CPS caseworkers, a therapist, and a child advocate, testified
about statements made by K.L. regarding sexual abuse.  Id. at 15.  The appellant claimed that the testimony was
inadmissible hearsay because it did not meet the requirements of family code
section 104.006.  Id.  We stated that section 104.006 is the
civil analogue of article 38.072 of the code of criminal procedure and, using
the same type of analysis employed by courts applying article 38.072, held that
K.L.=s statements were admissible.  Id.
at 16-17.  








The Houston Court of Appeals,
citing In re K.L., held that a child=s statements introduced in a caseworker=s report were not reliable because the report did not describe the
circumstances of the interview, including who was present.  In re E.A.K., 192 S.W.3d 133, 147
(Tex. App.CHouston
[14th Dist.] 2006, no pet.). 
Additionally, there was no evidence of whether the child was asked
leading questions or allowed to tell what happened to her, and there was no
evidence that the child understood the difference between truth and lies.  Id. at 146-47.  

Furthermore, the Amarillo
Court of Appeals has used factors similar to those listed in article 38.072 of
the code of criminal procedure to determine the reliability of a child=s outcry statement.  In re
P.E.W., 105 S.W.3d 771, 775 (Tex. App.CAmarillo 2003, no pet.).  In In
re P.E.W., the Amarillo court analyzed whether the child understood the
difference between truth and lies, whether the statements were voluntary or the
result of questioning, whether a child of his age would normally know about the
matters he described, and whether the statements could be corroborated by other
evidence.  Id. at 775.  Using these factors, the court determined the
statements were reliable.  Id. at
776.








Similarly, article 38.072 of
the code of criminal procedure provides a mechanism that requires that the
trial court determine on a case-by-case basis if outcry testimony reaches the
level of reliability required to be admissible as an exception to the hearsay
rule.  Tex.
Code Crim. Proc. Ann. art. 38.072 (Vernon 2005); Norris v. State, 788
S.W.2d 65, 70 (Tex. App.CDallas 1990,
pet. ref=d).  Indicia of reliability that
a trial court may consider under 38.072 
include (1) whether the child victim testifies at trial and admits
making the out-of-court statement, (2) whether the child understands the need
to tell the truth and has the ability to observe, recollect, and narrate, (3)
whether the other evidence corroborates the statement, (4) whether the child
made the statement spontaneously in his own terminology or whether evidence
exists of prior prompting or manipulation by adults, (5) whether the child=s statement is clear and unambiguous and rises to the needed level of
certainty, (6) whether the statement is consistent with other evidence, (7)
whether the statement describes an event that a child of the victim=s age could not be expected to fabricate, (8) whether the child
behaves abnormally after the contact, (9) whether the child has a motive to
fabricate the statement, (10) whether the child expects punishment because of
reporting the conduct, and (11) whether the accused had the opportunity to
commit the offense.  Norris, 788
S.W.2d at 70. 

Analysis








Under section 104.006, and by
comparison article 38.072, a court may use a child=s understanding of the difference between truth and lies in assessing
the reliability of a child=s outcry.  P.E.W., 105
S.W.3d at 775.  Here, both the foster
mother and Mother stated that M.R. is adamant about telling the truth.  See id. 
M.R. had no history of exaggeration or fibs.  Also, it is reasonable to deduce that a
seven-year-old child could describe the occurrences involved because she
experienced them firsthand.  See id.
at 776.








Additionally, other evidence
corroborates the content of M.R.=s statements.  See id.; see
also Norris, 788 S.W.2d at 70.  For example, M.R. said that her mother began
smoking AMerry Wonka@ after W.M.
was born.  Mother admitted that she
frequently stayed with her parents and that her parents and others living in
the house smoked marijuana.  Mother also
admitted that M.R. probably was not lying if she saw people doing drugs in
front of her. M.R. also stated that W.P.M. was one of the people doing drugs
with Mother.  At trial, when W.P.M. was
asked if he used drugs, he repeatedly invoked the Fifth Amendment.  Additionally, W.P.M.=s probation was revoked on a possession of methamphetamine
offense.  M.R. said that she had to sleep
in cars, and that she, W.M.,  and Mother
would drive around until two or three in the morning trying to find a place to
sleep.  She also talked about waiting in
the car while her mom would go inside to bars. 
Mother testified that she worked at a dance club as a cocktail
waitress.  M.R. talked about how she and
W.M. would get spankings with belts wearing no clothes.  She said that in one incident W.P.M. hit
Mother while  W.M. was in Mother=s arms and that Mother was knocked to the ground.  Initially, Mother denied any domestic abuse
by W.P.M. although she did testify to an incident in which W.P.M. tried to whip
M.R.  Later, Mother stated that W.P.M.
did Asmack@ her.  This evidence corroborates M.R.=s statements.  Also, M.R. was
available to testify, but W.P.M. chose not to call her to testify. 

W.P.M. argues that the
hearsay came Afrom a
highly interested witness@ and that
the Areliability of the foster mother was inherently suspect.@  W.P.M. appears to be
challenging the reliability of the outcry statements by challenging the foster
mother=s reliability in recounting the statements.  We find no cases addressing a similar issue
under section 104.006; thus, to complete our analysis, we look to article
38.072 of the code of criminal procedure for guidance in applying family code
section 104.006 to this issue.  See
K.L., 91 S.W.3d at 16.  








The reliability referred to
in article 38.072 is the reliability of the child=s declaration, not the witness relaying the child=s declaration.  Holland v.
State, 770 S.W.2d 56, 59 (Tex. App.CAustin 1989), aff=d, 802 S.W.2d 696 (Tex. Crim.
App. 1991); see also Duran v. State, 163 S.W.3d 253, 256 n.1 (Tex. App.CFort Worth 2005, no pet.). 
W.P.M. is challenging the credibility of the foster mother because of
her motivation to adopt the children; however, the trier of fact is the judge
of credibility.  In re J.J.R., 669
S.W.2d 840, 843 (Tex. App.CAmarillo 1984, writ dism=d.); see also Margraves v. State, 34 S.W.3d 912, 919 (Tex.
Crim. App. 2000).  Thus, in our analysis
of this complaint, we look to evidence concerning the reliability of M.R.=s statements to the foster mother, such as whether the statements were
spontaneous, whether CPS protocol was followed, and whether the child=s therapist or counselor was contacted by the witness after the
outcry, thereby allowing the counselor or therapist to talk with the child
further and properly question the child about the incident.  See Holland, 770 S.W.2d at 59. 








Here, there is no evidence
that the foster mother solicited information from M.R.  M.R. and the foster mother were in the
bathroom, getting ready for school one morning, when W.M. woke up and walked
in.  M.R. began talking about how cute
W.M. was when he was a baby and how she wished the foster mother could have
seen him as a baby.  As M.R. talked, she
made outcry statements about her life with Mother and W.P.M.  The evidence showed that the foster mother
followed CPS protocol by not asking M.R. any follow-up questions, by contacting
CPS soon after the outcry, and by allowing M.R.=s therapist to question M.R. further. 
See id.  Moreover, the
foster mother=s testimony
about the outcry was brief and not contrived. 
Id.  Thus, in this case,
the trial judge as the trier of fact had evidence before him that the
circumstances of the outcry were reliable. 
By ruling that the evidence was admissible, the trial judge implicitly
determined that the foster mother was not fabricating what M.R. told her and
concluded that the child=s
declaration was sufficiently reliable under 104.006.  

In sum, although the outcry
statements are not definite as to time,[3]
the specificity of the content and circumstances existing at the time of the
outcry demonstrate the statements= veracity.  Furthermore, there
is evidence in the record Atouching upon various indicia which courts often use to assess the
reliability of a child=s outcry.@  P.E.W., 105 S.W.3d at 776.  More
importantly, comparing those indicia to the evidence here supports the
conclusion that the trial court did not abuse its discretion by determining
that M.R.=s statements
were reliable; thus the trial court did not erroneously admit the statements.  See id; see also K.L, 91 S.W.3d at 17.  We overrule W.P.M.=s first issue.

Sufficiency of the Evidence 

A.     Issues
Addressed








In his second through eighth
issues, W.P.M. challenges the legal and factual sufficiency of the evidence to
support the termination under the grounds listed in family code sections
161.001(1)(D), (E), (N)[4]
and 161.002(b)(1)-(2).[5]  In his ninth issue, W.P.M. challenges the
factual sufficiency of the evidence to support the trial court=s finding that termination was in W.M.=s best interest.  The State has
conceded W.P.M.=s second,
third, fourth, fifth, and eighth issues challenging the sufficiency of the
evidence for termination. 








In three issues, Mother
argues that the evidence was legally and factually insufficient to support the
trial court=s
endangerment and factually insufficient to support its best interest findings
as to both children.

B.     Standard
of Review








A parent=s rights to Athe
companionship, care, custody, and management@ of his or her children are constitutional interests Afar more precious than any property right.@  Santosky v. Kramer, 455
U.S. 745, 758-59, 102 S. Ct. 1388, 1397 (1982); In re M.S., 115 S.W.3d
534, 547 (Tex. 2003); S.B., 207 S.W.3d at 884.  AWhile parental rights are of constitutional magnitude, they are not
absolute.  Just as it is imperative for
courts to recognize the constitutional underpinnings of the parent-child
relationship, it is also essential that emotional and physical interests of the
child not be sacrificed merely to preserve that right.@  In re C.H., 89 S.W.3d
17, 26 (Tex. 2002); S.B., 207 S.W.3d at 884.  In a termination case, the State seeks not
just to limit parental rights but to end them permanentlyCto divest the parent and child of all legal rights, privileges,
duties, and powers normally existing between them, except for the child=s right to inherit.  TEX. FAM. CODE ANN. ' 161.206(b) (Vernon Supp. 2007); Holick v. Smith, 685 S.W.2d
18, 20 (Tex. 1985); S.B., 207 S.W.3d at 884.  We strictly scrutinize termination
proceedings and strictly construe involuntary termination statutes in favor of
the parent.  Holick, 685 S.W.2d at
20-21; S.B., 207 S.W.3d at 884; In re E.S.S., 131 S.W.3d 632, 636
(Tex. App.CFort Worth
2004, no pet.).

Termination of parental rights is a drastic remedy and is of such
weight and gravity that due process requires the petitioner to justify
termination by clear and convincing evidence. 
TEX. FAM. CODE ANN. ''
161.001, 161.206(a); In re J.F.C., 96 S.W.3d 256, 263 (Tex. 2002); S.B.,
207 S.W.3d at 884.  This intermediate
standard falls between the preponderance standard of ordinary civil proceedings
and the reasonable doubt standard of criminal proceedings.  In re G.M., 596 S.W.2d 846, 847 (Tex.
1980); S.B., 207 S.W.3d at 884; In re K.W., 138 S.W.3d 420, 425
(Tex. App.CFort
Worth 2004, pet. denied).  It is defined
as the Ameasure
or degree of proof that will produce in the mind of the trier of fact a firm
belief or conviction as to the truth of the allegations sought to be
established.@  Tex.
Fam. Code Ann. '
101.007 (Vernon 2002); S.B., 207 S.W.3d at 884. 

 

1.     Legal sufficiency standard of review

 








The higher burden of proof in termination cases elevates the appellate
standard of legal sufficiency review.  J.F.C., 96 S.W.3d at 265; S.B., 207
S.W.3d at 884.  The traditional
no-evidence standard does not adequately protect the parents=
constitutional interests.  J.F.C.,
96 S.W.3d at 265; S.B., 207 S.W.3d at 884.  In reviewing the evidence for legal
sufficiency in parental termination cases, we must determine whether the
evidence is such that a factfinder could reasonably form a firm belief or
conviction that the grounds for termination were proven.  J.F.C., 96 S.W.3d at 265-66; S.B., 207
S.W.3d at 884.  We must review all the
evidence in the light most favorable to the finding and judgment.  J.F.C., 96 S.W.3d at 266; S.B., 207
S.W.3d at 884.  This means that we must
assume that the factfinder resolved any disputed facts in favor of its finding
if a reasonable factfinder could have done so. 
J.F.C., 96 S.W.3d at 266; S.B., 207 S.W.3d at 884.  We must also disregard all evidence that a
reasonable factfinder could have disbelieved. 
J.F.C., 96 S.W.3d at 266; S.B., 207 S.W.3d at 885.  We must consider, however, undisputed
evidence even if it is contrary to the finding. 
J.F.C., 96 S.W.3d at 266; S.B., 207 S.W.3d at 885.  That is, we must consider evidence favorable
to termination if a reasonable factfinder could, and disregard contrary
evidence unless a reasonable factfinder could not.  City of Keller v. Wilson, 168 S.W.3d
802, 827 (Tex. 2005); S.B., 207 S.W.3d at 885. 

 

2.     Factual Sufficiency Standard of Review

 








This higher burden of proof
also elevates the appellate standard of factual sufficiency review.  C.H., 89 S.W.3d at 25; S.B., 207
S.W.3d at 885.  A[A] finding that must be based on clear and convincing evidence cannot
be viewed on appeal the same as one that may be sustained on a mere
preponderance.@  C.H., 89 S.W.3d at 25; S.B., 207
S.W.3d at 885.  In considering whether
the evidence of termination rises to the level of being clear and convincing,
we must determine whether the evidence is such that a factfinder could
reasonably form a firm belief or conviction that the grounds for termination
were proven.  C.H., 89 S.W.3d at
25; S.B., 207 S.W.3d at 885.  Our
inquiry here is whether, on the entire record, a factfinder could reasonably
form a firm conviction or belief that the parent violated one of the conduct
provisions of section 161.001(1) and that the termination of the parent=s parental rights would be in the best interest of the child.  C.H., 89 S.W.3d at 28; S.B., 207
S.W.3d at 885. 








The distinction between legal
and factual sufficiency lies in how we review the evidence.  J.F.C., 96 S.W.3d at 266.  In a factual sufficiency review, in
determining whether the evidence is such that a factfinder could reasonably
form a firm belief or conviction that its finding was true, we must consider
whether disputed evidence is such that a reasonable factfinder could not have
resolved it in favor of the finding.  Id.  If, in light of the entire record, the
disputed evidence that a reasonable factfinder could not have credited in favor
of the finding is so significant that a factfinder could not reasonably have
formed a firm belief or conviction in the truth of its finding, then the
evidence is factually insufficient.  Id.  If we reverse on factual sufficiency grounds,
then we must detail in our opinion why we have concluded that a reasonable
factfinder could not have credited disputed evidence in favor of its
finding.  Id. at 266-67. 

C.     Paternity
and Constructive Abandonment

Because the State concedes
W.P.M.=s second, third, fourth, fifth, and eighth issues challenging
sufficiency of the evidence for termination, we sustain these issues.   However, the trial court need only find one
ground to terminate; thus, we will examine the sufficiency of the evidence as
to the other grounds found by the trial court. 
See P.E.W., 105 S.W.3d at 774.

D.     Endangerment
Findings

W.P.M. argues that the
evidence is factually insufficient to support the trial court=s findings that he engaged in conduct or knowingly placed W.M. with
persons engaged in conduct which endangered 
W.M.=s physical
or emotional well-being. Tex. Fam. Code
Ann. '
161.001(1)(D), (E).  Mother also argues
that the evidence is legally and factually insufficient to support the trial
court=s findings that she engaged in conduct or knowingly placed the
children with persons who engaged in conduct which endangered the children=s physical or emotional well-being.  Id.








In proceedings to terminate
the parent‑child relationship brought under section 161.001 of the family
code, the petitioner must establish one ground listed under subdivision (1) of
the statute and must also prove that termination is in the best interest of the
child.  TEX. FAM. CODE ANN. ' 161.001; In
re J.L., 163 S.W.3d 79, 84 (Tex. 2005); S.B., 207 S.W.3d at
884.  Both elements must be established;
termination may not be based solely on the best interest of the child as
determined by the trier of fact.  Tex.
Dep=t of Human
Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex.
1987); S.B., 207 S.W.3d at 884. 

1.     Analysis of Mother=s Claims

Here, there was evidence that
the children were exposed to domestic violence. 
Mother testified that she and W.P.M. had several disputes that involved
screaming.  Furthermore, Mother admitted
that W.P.M. Asmacked@ her in front of M.R.  There was
also conflicting evidence about an incident when W.P.M. hit Mother with W.M. in
her arms in front of M.R. 








Further, Mother admitted to
using both marijuana and methamphetamines in the past.  Although Mother stated at trial that she was
clean, she did not know when she last used drugs.[6]  In addition, since her children were removed,
Mother refused to take thirteen of the fifteen requested UAs and hair follicle
tests.  Mother repeatedly stated that she
could not remember why she did not show up to take the tests but said, AI shouldn=t have to do
that.  I don=t have to go do that.@  Furthermore, there is evidence
that Mother allowed her children to be in an environment where she knew drug
abuse occurred.  Mother acknowledged
that, at times, she lived with her parents, who actively used drugs in the
home.  Additionally, M.R. said that when
her grandparents, aunt, uncle, and W.P.M. smoked, she would be in charge of
watching W.M. and two other babies. 

The evidence also shows that
Mother refused to participate in her CPS service plan.  Mother admitted that she did not complete a
drug assessment, parenting classes, counseling sessions, or the requested drug
tests, all of which were required by her service plan.  Additionally, Mother failed to obtain housing
or employment.  The record indicates that
Mother was defiant when asked questions about her lack of participation in her
CPS service plan, but she also admitted that she did not keep track of dates
and names.








The record also contains
other evidence that indicates endangerment to the children.  For example, Mother ran from CPS by taking
the children out of voluntary placement and actively hid from CPS for four to
five months.  In addition, Mother followed
the foster mother=s vehicle
while the children were in the car with the foster mother.  The evidence shows that Mother was screaming
at the foster mother=s car while
Mother hung out the window of her car trying to get her children=s attention.  M.R. saw Mother=s actions and was upset by the incident.  Furthermore, the evidence shows that Mother
failed to supervise the children properly. 
CPS investigated two incidents that involved M.R. wandering alone around
an apartment complex.

Despite Mother=s repeated claims that she loved her kids and was a good mom, the evidence
shows that Mother exposed her children to domestic violence, placed them in an
environment of drug abuse, and refused to participate in her CPS service
plan.  Based on our review of the entire
record, we conclude that a factfinder could reasonably form a firm belief or
conviction that Mother (1) engaged in conduct that endangered the physical or
emotional well-being of M.R. and W.M and (2) knowingly placed or knowingly
allowed her children to remain in conditions or surroundings that endangered
their physical and emotional well-being. 
Therefore, we hold that the evidence is legally and factually sufficient
to support the trial court=s findings under section 161.001(1)(D) and (E).  Tex.
Fam. Code Ann. '
161.001(1)(D), (E); see S.B., 207 S.W.3d at 885. We overrule Mother=s first and second issues.

2.     Analysis
of W.P.M.=s Claims








W.P.M., at the time of trial,
was incarcerated for burglary of a habitation after violating his community
supervision by possessing methamphetamines. 
The burglary offense occurred before W.P.M. knew that Mother was pregnant
with W.M.  W.P.M. received community
supervision for that offense, but a few months after W.M. was born, he violated
his community supervision and received a two-year sentence.  W.P.M. had also been adjudicated guilty of
forgery of a government document and family violence. 

A voluntary, deliberate, and
conscious course of conduct by a parent is grounds for termination under
subsection (E) of 161.001.  In re
D.M., 58 S.W.3d 801, 812 (Tex. App.CFort Worth 2001, no pet.) (explaining that under subsection (E) a
court may order termination of parental rights if that parent has engaged in
conduct or knowingly placed the child with persons Aengaging in conduct which endangers the physical or emotional
well-being of the child@).  Imprisonment alone does not constitute
endangering conduct; however, it is a fact to consider on the issue of
endangerment.  Id.  The State must show that the
incarceration is a part of a course of conduct that is endangering the child.  Id. 

W.P.M. had been incarcerated
twenty-six months of W.M.=s
thirty-six-month life.  W.P.M.=s incarceration had affected his ability to ensure that W.M. was
properly taken care of and indicated a course of conduct that was endangering
to his child.  Moreover, W.P.M.=s incarceration prevented him from funding better living conditions
and financially supporting W.M.  The
evidence showed that W.P.M.=s continued criminality had contributed to the dangerous environment
in which W.M. had lived. 








The evidence also shows that
W.P.M. was aware that Mother sporadically lived with her parents and that her
parents were drug users.  Instead of
avoiding a criminal lifestyle, W.P.M.=s decisions prevented him from having a role in his son=s life or providing any support. 
The evidence also demonstrated that W.P.M. used drugs.

Based on our review of the
entire record, we conclude that a factfinder could reasonably form a firm
belief or conviction that W.P.M. engaged in conduct and knowingly placed W.M.
with persons who engaged in conduct which endangered the physical or emotional
well-being of W.M.  Therefore, we hold
that the evidence is factually sufficient to support the trial court=s findings under section 161.001(1)(E).  See S.B., 207 S.W.3d at 885. We overrule
W.P.M.=s seventh issue.[7]

E.     Best
Interest of Children 

Mother and W.P.M. both argue
that the evidence is insufficient to prove that termination of the parent-child
relationship was in the children=s best interest. 








Nonexclusive factors that the
trier of fact in a termination case may use in determining the best interest of
the child include the following:

(1)    the desires of the child;

 

(2)    the emotional and physical
needs of the child now and in the future; 

 

(3)    the emotional and physical
danger to the child now and in the future; 

 

(4)    the parental abilities of
the individuals seeking custody; 

 

(5)    the programs available to
assist these individuals to promote the best interest of the child;

 

(6)    the plans for the child by
these individuals or by the agency seeking custody;

 

(7)    the stability of the home
or proposed placement;

 

(8)    the acts or omissions of
the parent which may indicate that the existing parent‑child relationship
is not a proper one; and

 

(9)    any excuse for the acts or omissions of the
parent.

Holley v. Adams, 544 S.W.2d 367, 371‑72
(Tex. 1976); S.B., 207 S.W.3d at 886.








These factors are not
exhaustive.  Some listed factors may be
inapplicable to some cases; other factors not on the list may also be
considered when appropriate.  C.H.,
89 S.W.3d at 27; S.B., 207 S.W.3d at 886.  Furthermore, undisputed evidence of just one
factor may be sufficient in a particular case to support a finding that
termination is in the best interest of the children.  C.H., 89 S.W.3d at 27; S.B., 207
S.W.3d at 886.  On the other hand, the
presence of scant evidence relevant to each Holley factor will not
support such a finding.  C.H., 89
S.W.3d at 27; S.B., 207 S.W.3d at 886. 

1.     Domestic
Violence and Drug Abuse Evidence

In this case, there is
evidence that M.R. and W.M. have been exposed to domestic violence and drug
abuse.  Mother has shown no desire or
taken any action to modify her behavior in this respect.  Moreover, M.R. is aware of the abuse and
neglect.  M.R. told her foster mother
that Amommy started using drugs after [W.M]. was born.@  She called the drugs AMerry Wonka@ and
described the pipe and that smoke came out the top.  M.R. also said that when her grandparents,
aunt, uncle, and W.P.M. smoked, she would be in charge of watching W.M. and two
other babies.  These instances support
the trial court=s finding
that termination is in the best interest of the children.  See S.B., 207 S.W.3d at 887.

2.     Placement
of the Children








When M.R. and W.M. were
initially placed in foster care, M.R. had taken on the role of mother to W.M.,
and the children were very bonded to each other.  W.M. could not talk and was not
potty-trained.  M.R. had eating problems
and refused to eat anything but junk food. 
Since being with their foster family, both children have flourished and
adjusted to their new life.  W.M. took
speech therapy and was potty-trained. 
M.R. visited a therapist and had relinquished her motherly duties.  Moreover, the caseworker recommended that
Mother and W.P.M.=s parental
rights be terminated.  The foster family
wanted to adopt both M.R. and W.M. 
Although W.P.M. was incarcerated at the time of trial and his release
date was not certain, he argued that W.M. should live with W.P.M.=s mother; however, this would mean that W.M. would be separated from
M.R.  W.M. and M.R. had a very strong
brother-sister bond and separating them would Atotally destroy their whole demeanors, personalities, their identities@ according to the foster mother. 
The evidence showed that allowing the children to remain together would
be in their best interest.

Further, the evidence here
shows that M.R. and W.M.=s lifestyle
improved after CPS placed them with the foster family, supporting the trial
court=s finding that termination was in the children=s best interest.  See S.B., 207
S.W.3d at 887.

3.     Evidence
of an Unstable Lifestyle








Evidence of a parent=s unstable lifestyle can also support a factfinder=s conclusion that termination is in the child=s best interest.  S.B., 207
S.W.3d at 887-88; In re D.S., 176 S.W.3d 873, 879 (Tex. App.CFort Worth 2005, no pet.).  A
parent=s drug use, inability to provide a stable home, and failure to comply
with a family service plan support a finding that termination is in the best
interest of the child.  S.B., 207
S.W.3d at 887-88; D.S., 176 S.W.3d at 879.  Mother testified that she did not complete
aspects of her service plan, including a drug assessment, parenting classes,
counseling sessions, or the requested drug tests.  Mother also failed to obtain housing or
employment.  Additionally, the record
shows Mother=s lack of
participation in her CPS service plan. 
Evidence at trial also showed that the children slept in cars while
Mother drove around trying to find a place for them to sleep.  M.R. stated that she stayed in the car with a
man while her Mother went into bars.  The
evidence also showed that M.R. had to find food in dumpsters.

At the time of trial, W.P.M.
was incarcerated with a projected release date of August 18, 2007.  See S.B., 207 S.W.3d at 887-88.  In fact, W.P.M. had been incarcerated for
most of W.M.=s three-year
life.   A trial court may consider
incarceration as a best-interest factor. 
S.B., 207 S.W.3d at 887-88; see In re J.B.W., 99 S.W.3d
218, 229 (Tex. App.CFort Worth
2003, pet. denied) (holding that incarceration is one factor courts can
consider when determining the best interest of a child in a termination case).

4.     Parental
Rights as to Other Children








Both appellants have
additional children being raised by other people.[8]
Mother=s parental rights to her first two children were terminated in
Oklahoma, and a third child is being raised by his father in Fort Worth.  W.P.M. has a daughter being raised by her
grandparents in New Mexico.  He had not
seen her since Christmas of 2003.  The
evidence also showed that prior to this trial, W.P.M. had not written any
letters to the caseworker inquiring about W.M. 
See S.B., 207 S.W.3d at 888. 
Mother had not completed any tasks on her CPS service plan, including
the requested drug tests.  Id.  Furthermore, Mother had a confrontation with
the foster mother about doctor-prescribed medication for W.M.  Mother and W.P.M.=s forfeiture of their parental rights to other children and their
inability to follow court orders, avoid drug use, and maintain a stable
lifestyle supports the conclusion that termination is in the children=s best interest.  S.B., 207
S.W.3d at 887. 








Based upon our review of the
entire record, we conclude that the trial court could have reasonably formed a
firm conviction or belief that termination of Mother=s and W.P.M.=s rights was
in M.R.=s and W.M.=s best
interest.  See S.B., 207 S.W.3d at
888.  Therefore, we hold that the
evidence is factually sufficient to support the trial court=s finding that termination is in M.R.=s and W.M.=s best
interest.  

Accordingly, we overrule
Mother=s third issue and W.P.M.=s ninth issue.

Conclusion

Having overruled all of Mother=s and W.P.M.=s
dispositive issues,[9]
we affirm the trial court=s
judgment.

 

 

 

TERRIE
LIVINGSTON

JUSTICE

 

PANEL F:    LIVINGSTON,
DAUPHINOT, and HOLMAN, JJ.

 

DELIVERED: December
13, 2007

 











[1]At
the time of trial, M.R.=s
biological father, Michael, lived in Oklahoma City, Oklahoma.  He filed a general denial and his counsel
appeared at trial; however, he was not present. 
The trial court terminated his parental rights, and he does not appeal
the judgment. 





[2]The
record is not clear regarding the time of day M.R. was found wandering outside
alone; however, the record does state that the CPS Night Response unit
conducted the removal. 





[3]The
foster mother testified that M.R. made the statements one morning before
school, but she did not specify as to what day or exact time.





[4]Subsections
(D), (E), and (N) of section 161.001(1) provide that a parent=s
rights may be terminated if the court finds by clear and convincing evidence
that the parent has

(D)    knowingly placed or knowingly allowed the
child to remain in                       conditions or surroundings which
endanger the physical or                  emotional
well-being of the child,

(E)    engaged in conduct or knowingly placed the
child with                       persons who engaged in conduct which
endangers the                       physical
or emotional well-being of the child, or

(N)    constructively abandoned the child who has
been in the                      permanent or temporary managing
conservatorship of the                    Department
of Protective and Regulatory Services or an                   authorized
agency for not less than six months, and

(i)     the department or authorized agency has
made                          reasonable efforts to return the child
to the parent,

(ii)     the parent has not regularly visited or maintained
                              significant contact with the child, and

(iii)    the parent has demonstrated an inability to
provide the                            child with a safe environment.

Tex.
Fam. Code Ann. ' 161.001(1)(D), (E), (N)
(Vernon Supp. 2007).

 





[5]Section
161.002(b)(1)-(2) states that the rights of an alleged father may be terminated
if:

(1)    after being served with citation, he does
not respond by                      timely
filing an admission of paternity or a counterclaim for                   paternity under Chapter 160 or

(2)    he has not registered with the paternity
registry under                         Chapter 160, and after the exercise of
due diligence by the                 petitioner:

(A)    his identity and location are unknown or

(B)    his identity is known but he cannot be
located.

Tex. Fam. Code Ann. '
161.002(b)(1)-(2) (Vernon Supp. 2007).





[6]Mother
did not clarify this statement; therefore, it is unclear how recently she may
have used drugs.  





[7]Because
only one of the acts or omissions enumerated under subdivision (1) of section
161.001 needs to be established, we do not address W.P.M.=s
sixth issue, complaining of the factual sufficiency of the evidence to support
termination under section 161.001(1)(D). 
See S.B., 207 S.W.3d at 886.





[8]Although
the family code provides grounds for termination of parental rights to one
child based on termination of parental rights to another child, in this case,
termination of Mother=s
parental rights to two of her children in Oklahoma is only a factor the court
considers. See Tex. Fam. Code
Ann. '
161.001(1)(M).





[9]We do
not address W.P.M.=s
tenth issue, which was brought in the alternative in the event that we
determine that any of his other nine issues were not preserved. See Tex. R. App. P. 47.1; Reynolds v.
Murphy, 188 S.W.3d 252, 258 (Tex. App.CFort Worth 2006, pet.
denied); In re J.W., 97 S.W.3d 818, 825 (Tex. App.CDallas
2003, pet. denied).