NO. 07-11-00476-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL B

MAY 21, 2012

_____

IN THE INTEREST OF A.P.S., J.D.R., J.C.H., CHILDREN

_____

FROM THE 137TH DISTRICT COURT OF LUBBOCK COUNTY;

NO. 2010-551,681; HONORABLE KEVIN C. HART, JUDGE

_____

Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

**MEMORANDUM OPINION**

Appellant, John, appeals the trial court's order terminating his parental rights to son, J.C.H.[1] He contends on appeal that the evidence was insufficient to establish a predicate act or omission supporting termination and to support the trial court's finding that termination of the parent-child relationship was in the child's best interest. We will affirm the trial court's order.

---

[1] Throughout this opinion, J.C.H.'s parents will be referred to by the pseudonyms "John" and "Barbara," and the children will be identified by their initials. See TEX. FAM. CODE ANN. § 109.002(d) (West Supp. 2011); TEX. R. APP. P. 9.8(b).

Factual and Procedural History

The Department of Family and Protective Services received a call in March 2010 reporting that children, A.P.S., J.D.R., and J.C.H., were being physically neglected and that their mother, Barbara, had been hospitalized following a suicide attempt in the presence of the children. Living in the house at the time were the three children and Barbara. A.P.S.'s and J.D.R.'s fathers were apparently not involved in their children's lives, and J.CH.'s father, John, was in the Lubbock County Jail at the time of the report.

John was incarcerated as a result of an aggravated assault conviction stemming from a 2007 incident in which he attempted to hit Barbara with a car during an argument. Originally, he had been placed on four years' deferred adjudication community supervision in connection with those charges but had violated several of the terms of his community supervision by, *inter alia*, absconding from a required rehabilitation program and possessing marijuana. Based on the several violations alleged in the State's application, the trial court had adjudicated John guilty of aggravated assault and sentenced him to serve three years in prison. At the time of the final hearing, he was still serving that sentence.

John and Barbara's relationship was a troubled, tumultuous one, marred by instances of domestic violence, drug and alcohol abuse, and involvement with the law. Among them is the incident in which John attempted to hit Barbara with the car. As a condition of his original community supervision stemming from that incident, John was required to attend a six-month rehabilitation program. He began that program but left it. John tested positive for marijuana a number of times and admitted that he used

2

marijuana during his community supervision period. On Christmas Eve 2008, both John and Barbara were arrested for possession of marijuana. On Thanksgiving 2009, a neighbor called law enforcement when he heard an argument between John and Barbara. Officers responded and discovered an active warrant for John based on violations of his community supervision. He was arrested that night.

The psychologist who evaluated Barbara testified that she admitted to using crack cocaine four times a week when she could get it. She also reported her abuse of alcohol, marijuana, cocaine, methamphetamine, and prescription painkillers. She revealed to the psychologist that she had cut herself on three different occasions and had attempted suicide four times. She recounted two incidents of domestic violence.

At the final hearing, the trial court confirmed that Barbara voluntarily relinquished her rights to all three children. In her own medical history included with her relinquishment, she acknowledged depression, suicide attempts, and alcohol and drug abuse. Barbara reported that she was under the influence of alcohol and cocaine the time she last attempted suicide.

John appeared at the final hearing by telephone. He described his efforts to comply with the Department's service plan and his efforts to further his education while in prison. He also recounted two instances of domestic violence in the relationship, describing one as an instance in which he pushed Barbara away by her throat. Throughout his testimony on that topic, he seemed to minimize the gravity of the instances and maintained that the children were not present and did not witness the violence. The record suggests the contrary. John also indicated that he knew of

3

Barbara's drug and alcohol abuse. He explained that he and Barbara would consume a good amount of alcohol on various weekends. He testified that he had no idea of Barbara's use of methamphetamine. He admitted to having used cocaine with her on, at least, ten occasions but claimed that he did not know of her regular use of cocaine until he received the CPS report while incarcerated. He claimed that, any time the couple drank or did drugs, the children were at a babysitter's house, but admitted that he smoked marijuana on a daily basis during the relationship and acknowledged that the children were present when the couple was arrested on Christmas Eve 2008.

John explained that, when he and Barbara were not drunk or high, they tried to do family things together. He testified that he no longer does–but, at one point, did–plan to continue a relationship with Barbara; he explained that he could not be in a relationship with a woman who relinquished her rights to her children. He testified to having known of, at least, one suicide attempt by Barbara sometime between February and July of 2009, prior to his incarceration and during a time period he says the two were not seeing one another. He explained that his sister told him about the attempt and indicated that Barbara told him as well.

After hearing the evidence, the trial court found that the evidence supported a finding of three predicate grounds for termination and a finding that termination of the parent-child relationship was in J.C.H.'s best interest. John perfected appeal and, now, brings to this Court one issue challenging the legal and factual sufficiency of the evidence to support each of the predicate grounds for termination and the finding that termination was in J.C.H.'s best interest.

4

Applicable Law and Standards of Review

The natural right existing between parents and their children is of constitutional dimension. Holick v. Smith, 685 S.W.2d 18, 20 (Tex. 1985); see Santosky v. Kramer, 455 U.S. 745, 758–59, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). A decree terminating this natural right is complete, final, irrevocable, and divests for all time that natural right as well as all legal rights, privileges, duties, and powers between the parent and child except for the child's right to inherit. Holick, 685 S.W.2d at 20. That being so, we are required to strictly scrutinize termination proceedings. In re G.M., 596 S.W.2d 846, 846 (Tex. 1980). However, parental rights are not absolute, and the emotional and physical interests of a child must not be sacrificed merely to preserve those rights. In re C.H., 89 S.W.3d 17, 26 (Tex. 2002).

The Texas Family Code permits a court to terminate the parent-child relationship if the petitioner establishes (1) one or more acts or omissions enumerated under section 161.001 and (2) that termination of the parent-child relationship is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001 (West Supp. 2011); Holley v. Adams, 544 S.W.2d 367, 370 (Tex. 1976). Though evidence may be relevant to both elements, each element must be proven, and proof of one does not relieve the burden of proving the other. See In re C.H., 89 S.W.3d at 28. While both a statutory ground and best interest of the child must be proven, only one statutory ground is required to terminate parental rights under section 161.001. In re A.V., 113 S.W.3d 355, 362 (Tex. 2003). Therefore, we will affirm the trial court's order of termination if legally and factually sufficient evidence supports any one of the grounds found in the termination order,

5

provided the record shows that it was also in the best interest of the child for the parent's rights to be terminated. See id.

Due process requires the application of the clear and convincing standard of proof in cases involving involuntary termination of parental rights. In re J.F.C., 96 S.W.3d 256, 263 (Tex. 2002); see TEX. FAM. CODE ANN. § 161.206(a) (West 2009). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2009). This standard, which focuses on whether a reasonable jury could form a firm belief or conviction, retains the deference a reviewing court must have for the factfinder's role. In re C.H., 89 S.W.3d at 26.

In reviewing the legal sufficiency of the evidence supporting an order terminating parental rights, we look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction as to the truth of the allegations sought to be established. See In re J.F.C., 96 S.W.3d at 266. "To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." Id. In other words, we will disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. Id.

When reviewing the factual sufficiency of the evidence supporting a termination order, we determine "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the [Department]'s allegations." In re C.H., 89 S.W.3d at 25. In conducting this review, we consider whether the disputed evidence is such that a reasonable factfinder could not have resolved the disputed evidence in favor of its finding. In re J.F.C., 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." Id.

Analysis

Predicate Act or Omission

Among the three grounds the trial court found as supporting termination of John's parental rights to J.C.H. were subsection (D)'s environmental endangerment and subsection (E)'s course of conduct endangerment of the physical or emotional well-being of the children. See TEX. FAM. CODE ANN. § 161.001(1)(D), (E).[2] "[E]ndanger" means "to expose to loss or injury; to jeopardize." Tex. Dep't of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987). Although "'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is

---

[2] Especially with respect to the facts in the case at bar, the evidence concerning these two statutory grounds for termination found in subsections (D) and (E) is closely related. Because the connection between parental conduct and the children's conditions and surroundings is so strong here, we have included evidence relevant to both grounds in our review of the sufficiency of the evidence. See In re J.T.G., 121 S.W.3d 117, 126 (Tex.App.—Fort Worth 2003, no pet.); In re B.R., 822 S.W.2d 103, 106 (Tex.App.—Tyler 1991, writ denied).

not necessary that the conduct be directed at the child or that the child actually suffers injury." Id.; see In re P.E.W., 105 S.W.3d 771, 777 (Tex.App.—Amarillo 2003, no pet.) (observing that child "need not develop or succumb to a malady" in order to prove endangering conditions). Subsection (D) focuses on the suitability of the children's living conditions. In re R.D., 955 S.W.2d 364, 367–68 (Tex.App.—San Antonio 1997, pet. denied). However, although the focus of subsection (D) is on the children's living environment and not on the parents' conduct, parental conduct may produce an endangering "environment." See In re D.T., 34 S.W.3d 625, 633 (Tex.App.—Fort Worth 2000, pet. denied).

A parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct. In re J.O.A., 283 S.W.3d 336, 345 (Tex. 2009). The Texas Supreme Court found that a pattern of the parents' continued drug use and "two or three incidents of domestic violence" in addition to the father's consequent incarceration were sufficient to support termination of parental rights under subsection (E). Id. at 346. As further support, the court noted that the father permitted the mother to leave with the daughter despite the father's knowledge of the mother's drug use. Id. Similarly, here, the record contains evidence suggesting that the drug and alcohol abuse in the household was more than simply "remote and isolated incidents." See In re R.W., 129 S.W.3d 732, 741 (Tex.App.—Fort Worth 2004, pet. denied). Though John's testimony indicated that he was committed to making an earnest effort to behave more responsibly, the trial court, as finder of fact, was "not required to ignore a long history of dependency and destructive behavior merely because it allegedly abated

8

before trial." Id. (citing In re M.G.D., 108 S.W.3d 508, 513 (Tex.App.—Houston [14th Dist.] 2003, pet. denied); see In re J.O.A., 283 S.W.3d at 346.

Turning, next, to evidence of domestic violence in the household, we note that abuse does not need to be directed at the child or children in question to support a finding of endangerment. See In re W.J.H., 111 S.W.3d 707, 716 (Tex.App.—Fort Worth 2003, pet. denied). Abusive and violent criminal conduct by a parent can produce an environment that endangers a child's well-being. Jordan v. Dossey, 325 S.W.3d 700, 724 (Tex.App.—Houston [1st Dist.] 2010, pet. denied) (citing In re B.R., 822 S.W.2d at 106).

Here, John admitted that there had been instances of domestic violence between him and Barbara but maintains that those instances occurred outside the children's presence or in a manner that could not have negatively affected the children.[3] The record, however, shows that A.P.S. and J.D.H., the two older children in the household, reported having witnessed domestic violence between John and Barbara, and J.C.H. has referred to the incidents of domestic violence, suggesting that he was aware of it regardless of whether he witnessed the actual incidents.

Evidence that a person has engaged in abusive conduct in the past permits an inference that the person will continue violent behavior in the future. Id.; In re M.G.M., 163 S.W.3d 191, 202 (Tex.App.—Beaumont 2005, no pet.). Authority suggests that domestic violence, standing alone, may suffice to support termination of parental rights.

---

[3] To the extent John advances this position, we note that a child's presence when the violence occurs is not necessary to uphold a finding of endangerment. See In re W.J.H., 111 S.W.3d at 716.

See Lucas v. Tex. Dep't of Protective & Regulatory Servs., 949 S.W.2d 500, 503 (Tex.App.—Waco 1997, writ denied). On these facts, however, there is more evidence supporting the termination of John's parental rights.

Ultimately, the argument during which John attempted to hit Barbara with the car led to John's incarceration. Between the incident and incarceration, however, John had opportunities to avoid or minimize the time he would spend incarcerated. He did not take advantage of those opportunities. His continued disinclination to act in accordance with the law and abide by the terms of his community supervision subjected J.C.H. to a life of uncertainty and instability which endangered his physical and emotional well-being. See In re S.D., 980 S.W.2d 758, 763 (Tex.App.—San Antonio 1998, pet. denied); see also In re I.G.H., No. 07-10-00458-CV, 2012 Tex. App. LEXIS 1755, at *17–18 (Tex.App.—Amarillo Mar. 6, 2012, no pet.) (mem. op.). Mere imprisonment will not, standing alone, constitute engaging in conduct that endangers the physical or emotional well-being of the child. Boyd, 727 S.W.2d at 533. However, an environment which routinely subjects a child to the probability that he will be left alone because his parent is once again incarcerated endangers both the physical and emotional well-being of the child. In re S.D., 980 S.W.2d at 763; In re C.L.C., 119 S.W.3d 382, 393 (Tex.App.—Tyler 2003, no pet.); Robinson v. Tex. Dep't of Protective & Regulatory Servs., 89 S.W.3d 679, 687 (Tex.App.—Houston [1st Dist.] 2002, no pet.) (observing that "appellant knew her parental rights were in jeopardy when she continued her illegal drug use").

The record shows that despite the risk that John's continued pattern of behavior involving violence and drug abuse would ultimately lead to his incarceration for a

10

substantial period of time, John persisted in such behavior and was, in fact, incarcerated for a substantial period of time, leaving J.C.H. in Barbara's care. His persistence in such a pattern created an endangering environment and constituted endangering conduct not only in its own right, but also by the consequences his persistence carried with it: leaving the children in the mentally unstable Barbara's care.

The record shows that Barbara attempted suicide by slitting her wrists while the children were in her care. So, while her actions as a parent are not directly at issue in the case before us, we do consider her actions as the person with whom John left the children. Without question, her attempted suicide is conduct that endangered the physical and emotional well-being of the children. A parent's mental instability and attempt to commit suicide may contribute to a finding that the parent engaged in a course of conduct that endangered a child's well-being. See In re J.T.G., 121 S.W.3d at 126; In re A.M.C., 2 S.W.3d 707, 716 (Tex.App.—Waco 1999, no pet.) (upholding jury's determination of endangerment where evidence showed mother's suicidal thoughts, suicide attempts, and neglect); In re C.D., 664 S.W.2d 851, 853 (Tex.App.—Fort Worth 1984, no writ) (concluding that parent's mental condition and suicide attempts were relevant to endangering course of conduct inquiry).

The record suggests that John knew of, at least, one prior suicide attempt by Barbara and that he also knew of her drug and alcohol abuse (although his testimony suggests that he did not know the breadth and severity of her drug use) and, yet, engaged in a course of conduct that ultimately led to him being incarcerated and the children being left in Barbara's care. That said, John knowingly placed J.C.H. in the care of someone who engaged in conduct which endangered his physical or emotional

11

well-being.  See TEX. FAM. CODE ANN. § 161.001(1)(E); In re S.I.H., No. 02-11-00489-CV, 2012 Tex. App. LEXIS 2081, at *14 (Tex.App.—Fort Worth Mar. 15, 2012) (mem. op.) (noting that, despite knowing about caretaker's history of drug abuse, attempted suicides, and "psychotic issues," mother did not return to care for the child or ensure that someone else could); In re D.R.J., No. 07-08-00410-CV, 2009 Tex. App. LEXIS 5231, at *20–21 (Tex.App.—Amarillo July 8, 2009, pet. denied) (mem. op.) (concluding that, because mother knew of caretaker's abusive conduct and involvement in dealing drugs, she knowingly placed her children in the care of someone who engaged in conduct which endangered their physical or emotional well-being).  Further, we note that John, knowing of Barbara's substance abuse and mental instability, made no effort prior to the Department's intervention, to make alternative childcare arrangements or to make any effort to safeguard the welfare of the children, who were, in his absence, left solely in Barbara's care.  Only when the Department intervened did John make any attempt to find any other caretaker.

Considering the patterns of drug and alcohol abuse, domestic violence, Barbara's suicidal tendencies, John's extended incarceration, and the unstable environment the convergence of all these factors created, the evidence is sufficient to support the trial court's findings on the grounds for termination set forth in both subsections (D) and (E) of Section 161.001(1).  See In re J.T.G., 121 S.W.3d at 128 (holding evidence sufficient to support findings under subsections (D) and (E) given evidence of continued drug use, domestic violence, and suicide attempt).

12

Best Interest

The Texas Supreme Court has recognized a non-exhaustive list of factors that are pertinent to the inquiry whether termination of parental rights is in the best interest of the child: (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. See Holley, 544 S.W.2d at 371–72; see also TEX. FAM. CODE ANN. § 263.307 (West 2009) (providing extensive list of factors that may be considered in determining child's best interest). In examining the best interest of the child, we may consider evidence that was also probative of the predicate act or omission. See In re C.H., 89 S.W.3d at 28. The best interest determination may rely on direct or circumstantial evidence, subjective facts, and the totality of the evidence. In re N.R.T., 338 S.W.3d 667, 677 (Tex.App.—Amarillo 2011, no. pet).

The Department need not prove all nine Holley factors, and the absence of evidence relevant to some of those factors does not bar a finding that termination is in the child's best interest, especially in the face of undisputed evidence that the parental relationship endangered the child. See In re C.H., 89 S.W.3d at 27. No one Holley factor is controlling, and evidence of one factor may be sufficient to support a finding

13

that termination is in the child's best interest. In re A.P., 184 S.W.3d 410, 414 (Tex.App.—Dallas 2006, no pet.)

The record suggests that, while John was in prison, he completed his G.E.D. and took classes preparing him for work in the electrical trade. He explained that he planned to take advantage of his newly-attained education and skills to try to find a job in the electrical field. He outlined a fairly detailed strategy relating to his career goals. He also explained that he had been admitted into a rehabilitation program that would earn him an earlier release date from prison.

John, though apparently determined and hopeful regarding his rehabilitation program and subsequent release from prison, has no means of ensuring that he has adequate housing or means to care for J.C.H. He expressed a hope that he could live with his sister but noted that the parole board had yet to approve such a plan. He also expressed some concerns over the suitability of his sister's house, admitting that police were often summoned to her home. If he were unable to find a family member with whom he could live, he conceded, he would have to live, likely for three to six months, in a halfway house, where children are not permitted to live. So, although John expressed a desire to meet J.C.H.'s needs, the simple facts are that, at the time of the final hearing, he was still incarcerated and had a limited ability to plan for his or J.C.H.'s future despite the prospect of his release in the upcoming months.[4] See In re M.D.S., 1 S.W.3d 190, 200 (Tex.App.—Amarillo 1999, no pet.). For these reasons, the

---

[4] The record indicates that John proposed two homes as possible placements for J.C.H.: John's mother's and his sister's homes. Based on limited resources and references and on omissions from criminal history disclosure, the Department denied placement in John's mother's home. John's sister failed to correspond with the Department by phone or letter so that the Department could complete a home study.

14

uncertainty of John's plans for J.C.H. weigh in favor of termination and leave us unable to evaluate the stability of the hypothetical home he envisions.

In contrast, the Department plans to seek an adoptive family for J.C.H. Currently, he is placed in foster care with his older sister, A.P.S. Their brother, J.D.R., has been adopted by his father's family. While in foster care, J.C.H. is receiving counseling to address behavioral issues which include ADHD, adjustment disorder, and aggressiveness. The Department maintains, and John concedes, that foster care is providing J.C.H. with the most stability and resources that he has ever known.

John did complete some of the exercises implemented by the Department to improve his parenting skills and appeared to be receptive to completing more. However, the trial court was not required to ignore or somehow discount John's patterns of drug abuse and incarceration. See In re D.M., 58 S.W.3d 801, 814 (Tex.App.—Fort Worth 2001, no pet.). We also observe the impact of John's patterns, leading to the point where J.C.H. was left in the sole custody of his mentally unstable mother. See Jordan, 325 S.W.3d at 733 (on best interest determination in relation to unstable, suicidal caretaker).

John recalled having shared special memories with all of the children and described special activities he and J.C.H. shared. While we recognize the special bond between father and son, we cannot permit that recognition or our own sentiment to override the best interest of J.C.H. See In re W.S.M., 107 S.W.3d 772, 773 (Tex. App.—Texarkana 2003, no pet.).

15

Instead, a child's need for permanence is of paramount importance in his or her present and future emotional and physical needs. See Dupree v. Tex. Dep't of Protective & Regulatory Servs., 907 S.W.2d 81, 87 (Tex.App.—Dallas 1995, no writ). John, while he earnestly expressed his desire to provide J.C.H. permanence, is not in a position to do so. Further, his pattern of behavior and his uncertain position upon release from prison do not fare well when compared to the Department's provision of stability in foster care and its plans for J.C.H.'s adoption into a permanent home. We remain mindful, as did the trial court in its oral pronouncement, that we are to look, not at John's ideals and designs for the parent-child relationship, but whether termination of that relationship in the best interest of J.C.H. And the record before us supports the finding that it is. We overrule John's challenge to the evidence supporting the trial court's finding regarding J.C.H.'s best interest.

## Conclusion

Having overruled the issue John has presented to this Court, we affirm the trial court's order terminating John's parental rights to J.C.H.

Mackey K. Hancock
Justice