# NO. 12-12-00225-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *IN THE INTEREST OF* | § | *APPEAL FROM THE 294TH* |
| *B.M.A.J.,* | § | *JUDICIAL DISTRICT COURT* |
| *A CHILD* | § | *VAN ZANDT COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

J.S. appeals the termination of her parental rights to B.M.A.J.  J.S. raises five issues on appeal.  We affirm.

## BACKGROUND

J.S. and W.J. are the parents of B.M.A.J., who was born on October 18, 2006.[1]  On January 7, 2011, the Department of Family and Protective Services (the Department or CPS) filed a petition for protection of B.M.A.J., for conservatorship, and for termination in a suit affecting the parent-child relationship.  That same day, the trial court signed an emergency order naming the Department as temporary sole managing conservator of B.M.A.J.  On January 13, 2011, an adversary hearing was held, and the trial court appointed the Department as temporary managing conservator and J.S. and W.J. as temporary possessory conservators of B.M.A.J.

A bench trial was held on May 9, 2012.[2]  Ultimately, the associate judge determined that the parent-child relationship between J.S. and B.M.A.J. should be terminated.

---

[1] W.J. signed an affidavit of voluntary relinquishment of his parental rights to B.M.A.J., and the court terminated his parental rights on June 9, 2011.  W.J. did not appeal.

[2] The original dismissal date for this case was January 9, 2012.  On January 3, 2012, the associate judge extended the dismissal date to July 7, 2012.  *See* TEX. FAM. CODE ANN. § 263.401(a), (b) (West 2008).

Involuntary termination of parental rights embodies fundamental constitutional rights. *In re C.L.C.*, 119 S.W.3d 382, 390 (Tex. App.—Tyler 2003, no pet.); *Vela v. Marywood*, 17 S.W.3d 750, 759 (Tex. App.—Austin 2000), *pet. denied per curiam*, 53 S.W.3d 684 (Tex. 2001). When the state seeks to terminate one's parental rights, it seeks not only to infringe one's fundamental liberty interest, but to end it. *See In re J.F.C.*, 96 S.W.3d 256, 273 (Tex. 2002). A termination decree is "complete, final, irrevocable [and] divests for all time the parent and child of all legal rights, privileges, duties, and powers with respect to each other except for the child's right to inherit." *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976); *In re Shaw*, 966 S.W.2d 174, 179 (Tex. App.—El Paso 1998, no pet.). Thus, the breaking of bonds between a parent and child "can never be justified without the most solid and substantial reasons." *Wiley*, 543 S.W.2d at 352; *In re Shaw*, 966 S.W.2d at 179. Because a termination action "permanently sunders" the bonds between a parent and child, the proceedings must be strictly scrutinized. *Wiley*, 543 S.W.2d at 352; *In re Shaw*, 966 S.W.2d at 179. However, parental rights are not absolute, and it is vital that the emotional and physical interests of the child not be sacrificed at the expense of preserving that right. *See In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

Section 161.001 of the Texas Family Code permits the termination of parental rights if two elements are met. TEX. FAM. CODE ANN. § 161.001 (West Supp. 2012). First, the parent must have engaged in any one of the acts or omissions itemized in the first subsection of the statute. *Id.* § 161.001(1) (West Supp. 2012); *In re C.L.C.*, 119 S.W.3d at 390. Second, termination must be in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(2) (West Supp. 2012); *In re C.L.C.*, 119 S.W.3d at 390. Both elements must be proved by "clear and convincing evidence," and proof of one element does not alleviate the petitioner's burden of proving the other. TEX. FAM. CODE ANN. § 161.001; *In re C.L.C.*, 119 S.W.3d at 390. "Clear and convincing evidence" means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. TEX. FAM. CODE ANN. § 101.007 (West 2008). Because there is a strong presumption that the best interest of the child is served by preserving the parent-child relationship, the burden of proof rests upon the party

seeking to deprive the parent of his or her parental rights. *See Wiley*, 543 S.W.2d at 352; *In re C.L.C.*, 119 S.W.3d at 391.

## REQUEST FOR DE NOVO TRIAL

In her first issue, J.S. contends that the trial court erred by refusing to grant her request for a de novo trial. We disagree.

### Applicable Law

The family code authorizes the presiding judge of each administrative judicial region to appoint associate judges to preside over child protection cases. *See* TEX. FAM. CODE ANN. § 201.201 (West. Supp. 2012). If an associate judge is appointed, all child protection cases shall be referred to the associate judge. *See id.* § 201.201(d). Once appointed, the associate judge has the authority to render and sign any pretrial order and recommend to the referring court any order after a trial on the merits. *See* TEX. FAM. CODE ANN. § 201.204 (West 2008); *see also Attorney Gen. of Tex. v. Orr*, 989 S.W.2d 464, 467 (Tex. App.—Austin 1999, no pet.). After a hearing, the associate judge shall provide the parties participating in the hearing notice of the substance of the associate judge's report, including any proposed order. TEX. FAM. CODE ANN. § 201.011(b) (West 2008). Notice of the associate judge's report may be given "in open court, or by oral statement or a copy of the associate judge's written report, including any proposed order . . . ." *Id.* § 201.011(c)(1); *see also Perez v. Tex. Dep't of Protective & Regulatory Servs.*, No. 03-00-00812-CV, 2002 WL 534138, at *2 (Tex. App.—Austin Apr. 11, 2002, no pet.).

A party may appeal the associate judge's report by filing a written request for a de novo hearing not later than the seventh working day after the date the party receives notice of the substance of the associate judge's report. TEX. FAM. CODE ANN. § 201.015(a) (West Supp. 2012). A party that files a notice of appeal to the referring court in compliance with the family code is entitled to a de novo hearing before that court. *See id.* § 201.015(f); *Orr*, 989 S.W.2d at 467.

### Discussion

Here, the associate judge conducted a bench trial on May 9, 2012. That same day, after hearing closing arguments, the associate judge announced as follows:

> I do find by clear and convincing evidence that [J.S.] has knowingly placed or allowed the child to remain in conditions or surroundings which endangered the physical or emotional well[] being of the child.
>
> I further find by clear and convincing evidence that [J.S.] has engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangered the physical or emotional well[]being of the child.
>
> . . . .
>
> I further find by clear and convincing evidence that it's in the best interest of [B.M.A.J.] that the parental rights of [J.S.] be terminated. I thus order the termination of the parental rights of [J.S.] to the child [B.M.A.J.].

J.S. filed a request for a de novo hearing on July 2, 2012. She argues that her request was timely because the associate judge did not issue her report in writing until June 14, 2012, and she did not receive notice of the associate judge's written order of termination until June 21, 2012. J.S. cites three cases to support her contention that the time period for filing a request for a de novo hearing does not begin until the associate judge issues her report in writing. But in these cases, the timeliness of the request did not turn on whether the substance of the associate judge's report was made orally or in writing. *See **Schwertner v. Tex. Dep't of Family & Protective Servs.***, No. 03-11-00347-CV, 2011 WL 5138714, at *3 (Tex. App.—Austin Oct. 25, 2011, no pet.) (mem. op.) (assuming ineffective assistance of counsel when request for de novo hearing was untimely); ***In re M.P.***, No. 04-08-00881-CV, 2009 WL 2413694, at *1 (Tex. App.—San Antonio Aug. 5, 2009, no pet.) (mem. op.) (request for de novo hearing untimely when filed eight working days after attorney signed order approving it as to form); ***Harrell v. Harrell***, 986 S.W.2d 629, 631 (Tex. App.—El Paso 1998, no pet.) (referring court erred by entering order after appellant filed timely request for de novo hearing). Thus, these cases are inapplicable here.

Because the associate judge announced, orally and in open court, the grounds on which she terminated J.S.'s parental rights, J.S. had notice of the substance of the associate judge's report on May 9, 2012.[3] *See* TEX. FAM. CODE ANN. § 201.011(c); *id.* § 201.015(a). Therefore, J.S.'s July 2, 2012 request for a de novo hearing was untimely. *See, e.g.*, ***Perez***, 2002 WL 534138, at *3 (oral statements by presiding judge in open court sufficiently expressed "substance" of decision to trigger deadline to appeal decision to referring court). Consequently, J.S. was not

---

[3] At the time of the associate judge's pronouncement, Appellant was present in court and represented by counsel.

4

entitled to a de novo hearing. *See In re E.M.*, 54 S.W.3d 849, 852 (Tex. App.—Corpus Christi 2001, no pet.) (to be entitled to de novo hearing, party must timely file notice of appeal). The trial court did not err in denying J.S.'s motion for a trial de novo. We overrule J.S.'s first issue.

## STANDARD OF REVIEW: SUFFICIENCY OF THE EVIDENCE

When, as here, the burden of proof is clear and convincing evidence, we conduct a legal sufficiency review by looking at all of the evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d at 266. We must assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so. *Id.* Thus, it follows that the reviewing court should disregard all evidence that a reasonable fact finder could have disbelieved or found to have been incredible, but this does not mean that the reviewing court must disregard all evidence that does not support the finding. *Id.* Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence. *Id.* If, after conducting our legal sufficiency review, we determine that no reasonable fact finder could form a firm belief or conviction that the matter which must be proven is true, then we will conclude that the evidence is legally insufficient. *Id.*

When we conduct a factual sufficiency review, we must give due consideration to evidence that the fact finder could reasonably have found to be clear and convincing. *Id.* Our inquiry is whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the Department's allegations. *Id.* We consider whether the disputed evidence is such that a reasonable fact finder could not have resolved that disputed evidence in favor of its finding. *Id.* If, when viewed in light of the entire record, the disputed evidence is so significant that a fact finder could not have reasonably formed a firm belief or conviction, then the evidence is factually insufficient. *Id.* In finding evidence factually insufficient, the appellate court should detail why it has concluded that a reasonable fact finder could not have credited disputed evidence in favor of its finding. *Id.* at 267.

The standard of review for legal and factual sufficiency challenges maintains a deferential standard for the fact finder's role, which means the trier of fact is the exclusive judge of the credibility of the witnesses and weight to be given their testimony. *In re C.H.*, 89 S.W.3d at 26-

5

27; ***Nordstrom v. Nordstrom***, 965 S.W.2d 575, 580 (Tex. App.—Houston [1st Dist.] 1997, pet. denied). Thus, our review must not be so rigorous that the only fact findings that could withstand review are those established beyond a reasonable doubt. ***In re C.H.***, 89 S.W.3d at 26.

## TERMINATION UNDER SECTION 161.001(1)(E)

In her second and third issues, J.S. challenges the legal and factual sufficiency of the evidence supporting termination of her parental rights under subsections 161.001(1)(D) and (E) of the family code. We first discuss the sufficiency of the evidence with regard to subsection (E), whether J.S. engaged in conduct or knowingly placed B.M.A.J. with persons who engaged in conduct that endangered his physical or emotional well being. *See* TEX. FAM. CODE ANN. § 161.001(1)(E) (West Supp. 2012).

**Applicable Law**

A court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent has engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangers the physical or emotional well being of the child. *See **id.*** § 161.001(1)(E). "Endanger" means more than a threat of metaphysical injury or the possible ill effects of a less than ideal environment. ***Texas Dep't of Human Servs. v. Boyd***, 727 S.W.2d 531, 533 (Tex. 1987). It is not necessary that the conduct be directed at the child or that the child actually suffers injury. ***Id.*** It is sufficient that the child's well being be jeopardized or exposed to loss or injury. ***In re J.J.***, 911 S.W.2d 437, 440 (Tex. App.—Texarkana 1995, writ denied). A child need not develop or succumb to a malady before it can be said that endangerment arises. *See **In re P.E.W.***, 105 S.W.3d 771, 777 (Tex. App.—Amarillo 2003, no pet.).

The cause of the endangerment must be the direct result of the parent's conduct and must be the result of a continuing course of conduct rather than a single act or omission. ***In re A.S.***, 261 S.W.3d 76, 83, 86 (Tex. App.—Houston [14th Dist.] 2008, pet. denied); *see also **In re Baby Boy R.***, 191 S.W.3d 916, 925 (Tex. App.—Dallas 2006, pet. denied) (instability and incarceration can be continuing course of conduct supporting termination). Evidence of a parent's endangering conduct includes not only the parent's actions, but also the parent's omissions or failures to act. ***Dupree v. Tex. Dep't of Protective & Regulatory Servs.***, 907 S.W.2d 81, 83-84 (Tex. App.—

6

Dallas 1995, no writ). The specific danger to the child's well being may be inferred from parental misconduct standing alone. *In re T.T.F.*, 331 S.W.3d 461, 483 (Tex. App.—Fort Worth 2010, no pet.).

**Evidence in the Light Most Favorable to the Finding**

B.M.A.J. was four years old at the time of his most recent removal from his mother's custody. During the late night hours of January 6, 2011, B.M.A.J.'s father, W.J., called the police, stating that B.M.A.J. was "out of control." W.J. wanted to "scare[] [B.M.A.J.] straight" and asked the police to come and arrest and handcuff B.M.A.J., put him in the police car, and then put him in a boot camp. When the police were called, J.S. was at home with B.M.A.J. and W.J. and was sick. After law enforcement arrived, CPS was notified and CPS Investigator Terri Baker came to the residence. According to Baker, as she drove towards the residence, she noticed that the outside was dark, with no signs of electricity, and the house appeared vacant. When Baker arrived, she found mattresses on the living room floor. The front door could be opened only wide enough for people to enter the home one at a time because the mattresses were obstructing the door.

Once inside, Baker observed a chair and three mattresses on the living room floor along with "bits and pieces [of] debris." The mattress believed to be B.M.A.J.'s had a "thin" blanket and was "butted up next to an open-flame heater." A window in the front of the house was broken, and pieces of glass remained in the window with nothing to prevent the glass from falling into the house. Baker testified that a sheet covered the window.

Baker also stated that upon walking into another room, she saw a "huge" litter box that appeared not to have been emptied for a "while," that animal feces "covered" the floor, and that along with the feces in the floor were children's toys. Baker's affidavit also made mention of "finger-shaped" bruising on B.M.A.J., but at the time of trial, she could not remember where the bruising was located. No photographs were presented to show the bruising that Baker mentioned in her affidavit.

As she walked into the kitchen, Baker saw "overflowing" trash cans, several dishes in the sink, and medication on the counter that was prescribed for B.M.A.J. and required refrigeration. Baker testified that because there was no electricity, the refrigerator was not working and had a "horrid" smell. Baker observed a "burned spot" on the kitchen floor. At trial, W.J. explained that

7

approximately two weeks before his removal, B.M.A.J. started a fire in the kitchen while he and J.S. were at home.

J.S.'s sister, S.M., testified that when J.S. and W.J. first moved into the home, B.M.A.J. lived with her because J.S. said their home was not "safe" for B.M.A.J. But on the day before B.M.A.J. was removed, W.J. picked up B.M.A.J. from S.M.'s house to take him to W.J. and J.S.'s residence, even though J.S. was sick. S.M. testified that she had never been inside J.S.'s residence, but when she saw the photographs of the home at the time of B.M.A.J.'s removal, she agreed that B.M.A.J. "shouldn't have been there." Upon seeing the photographs, S.M. confirmed that she would not allow her own children to live there, and that it did not surprise her that CPS removed B.M.A.J. because the conditions of the residence were "hygienically" dangerous for him.

J.S.'s fiancé testified on J.S.'s behalf and was also shown photographs of the residence. When asked whether he would have allowed his child to live in conditions like those depicted in the photographs, he answered, "Huh-[]uh."

Testimony revealed that the January 7, 2011 removal of B.M.A.J. from his mother's custody was the second time he had been removed since birth. J.S. confirmed that she had custody of B.M.A.J. for only nine months of his life, "more or less."[4] Testimony also revealed that CPS received a referral from the hospital when B.M.A.J. was one day old, and the family was given the equivalent of what is now referred to as "family-based safety services." But despite these services, B.M.A.J. was removed when he was eight weeks old due to "questionable" bruising, "adult-size bite marks and other miscellaneous bruising along [B.M.A.J.'s] body." It was also confirmed that B.M.A.J. had suffered a fractured skull. As a result, B.M.A.J. lived with another family until J.S. sought and obtained permanent managing conservatorship of him in the late summer of 2010.[5] J.S. testified B.M.A.J.'s first removal occurred "[b]ecause [she] was working. And that's when everything fell apart."

**Undisputed Facts Not Supporting the Finding**

There was no testimony that J.S. was the individual who inflicted the injuries that resulted in B.M.A.J.'s first removal. There is also no evidence that J.S. inflicted any injuries on B.M.A.J. leading up to his second removal.

---

[4] At the time of trial, B.M.A.J. was five years old.

[5] By the time J.S. regained permanent managing conservatorship of B.M.A.J., he was almost four years old.

## Disputed Evidence

The majority of the disputed evidence at trial related to the length of B.M.A.J.'s stay at W.J. and J.S.'s residence. There was testimony that B.M.A.J. stayed at S.M.'s house most of the time, and had stayed at W.J. and J.S.'s residence "[m]aybe two [or] three" nights. S.M. testified that B.M.A.J. lived with her approximately one month, but W.J. testified that B.M.A.J. lived with S.M. for two or three months. W.J. testified that B.M.A.J. was mostly at S.M.'s house because he would play with his cousins, but then stated that B.M.A.J.'s cousins would also come to their (W.J. and J.S.'s) house to play. J.S.'s testimony, however, contradicted both parents' contention that B.M.A.J. did not live with them when she testified that B.M.A.J. was in "his" room when CPS arrived on the morning of January 7, 2011, to remove him from their home.

J.S. testified that they lost electricity in their house within one month of living there and were scheduled to move in two days at the time of B.M.A.J.'s removal. She explained that mattresses were on the floor in the living room because all of their other furniture was at their new home. J.S. testified that their original move-in date had been delayed because she had not yet paid the landlord. Finally, J.S. and W.J. testified that they did not have any pets, thus contradicting the photographs of a dog, cat, animal feces, and pet food inside the home.

## Conclusion

After viewing the evidence in the light most favorable to the finding in addition to the undisputed facts not supporting the finding, a reasonable fact finder could form a firm belief or conviction that J.S. engaged in conduct or knowingly placed B.M.A.J. with persons who engaged in conduct that endangered his physical or emotional well being. *See In re J.F.C.*, 96 S.W.3d at 266. B.M.A.J. was first removed from J.S.'s care after suffering from a fractured skull, bruises, and adult-sized bite marks on his body. After J.S. regained custody of B.M.A.J., CPS had to intervene a second time to remove B.M.A.J. from endangering conditions. *See In re C.L.C.*, 119 S.W.3d at 392 (unsanitary conditions can qualify as surroundings that endanger a child). Regardless of whether J.S. inflicted the injuries B.M.A.J. suffered as an infant and young child, the evidence is legally sufficient to show that J.S. engaged in a continuous course of conduct in which she again placed B.M.A.J. in conditions or surroundings that subjected him to physical and emotional harm. *See In re M.C.*, 917 S.W.2d 268, 270 (Tex. 1996) (extraordinarily unsanitary conditions jeopardized children's health and was some evidence to support termination). We

9

conclude the evidence is legally sufficient to support termination of J.S.'s parental rights under subsection (E).

After viewing the entire record and considering the disputed evidence, a fact finder could reasonably have formed a firm belief or conviction about the truth of the Department's allegations. *See In re J.F.C.*, 96 S.W.3d at 266. Regardless of whether W.J. and J.S.'s residence was a "temporary stop," that does not call into question the conditions and surroundings in which B.M.A.J. was placed while he was in J.S.'s custody. We conclude the evidence is factually sufficient to support termination of J.S.'s parental rights under subsection (E). Accordingly, we overrule J.S.'s third issue.

Because we have held that the evidence is legally and factually sufficient to terminate J.S.'s parental rights pursuant to subsection 161.001(1)(E), we need not address J.S.'s second issue relating to the sufficiency of the evidence for termination under subsection (D). *See* TEX. R. APP. P. 47.1; *In re C.C.*, No. 12-09-00429-CV, 2011 WL 198595, at *6 n.2 (Tex. App.—Tyler Jan. 19, 2011, no pet.) (mem. op) (when evidence is sufficient to support termination under one ground, appellate court need not address challenges to other grounds for termination).

## BEST INTEREST OF THE CHILD

In her fourth issue, J.S. argues that the evidence is legally and factually insufficient to show that termination of her parental rights is in B.M.A.J.'s best interest.

### Applicable Law

Parental rights may not be terminated merely because a child might be better off living elsewhere. *In re C.R.*, 263 S.W.3d 368, 375 (Tex. App.—Dallas 2008, no pet.). The party seeking termination must prove by clear and convincing evidence that termination of a parent's rights to his or her child is in the child's best interest. *See* TEX. FAM. CODE ANN. § 161.001(2). The prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest. *See* TEX. FAM. CODE ANN. § 263.307(a) (West 2008). But there is also a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).

In determining the best interest of the child, the courts consider a number of factors including (1) the desires of the child; (2) the emotional and physical needs of the child now and in

10

the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals; (6) the plans for the child by these individuals; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). The family code also provides a list of factors to consider whether a child's parents are willing and able to provide a child with a safe environment, which we will consider in conjunction with the above-mentioned *Holley* factors. *See* TEX. FAM. CODE ANN. § 263.307. The applicable statutory factors here include (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; and (4) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home. *See id.* § 263.307(b).

The Department need not prove all of the statutory or *Holley* factors to prove that termination is in the child's best interest. *See Holley*, 544 S.W.2d at 372; *In re J.I.T.P.*, 99 S.W.3d 841, 848 (Tex. App.—Houston [14th Dist.] 2003, no pet.). Undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *In re M.R.J.M.*, 280 S.W.3d 494, 507 (Tex. App.—Fort Worth 2009, no pet.). But the presence of scant evidence relevant to each factor will not support such a finding. *Id.* Evidence supporting termination of parental rights is also probative in determining whether termination is in the best interest of the child. *See In re C.H.*, 89 S.W.3d at 28-29.

**Analysis**

At the time of trial, B.M.A.J. was five years old. Testimony from caseworker Rachel King and CASA supervisor Joni Lunsford showed that B.M.A.J. typically referred to J.S. by her first name and seemed indifferent when his visitation periods with J.S. were over. King testified that she heard B.M.A.J. call J.S. "mom" twice and heard him tell J.S. "I love you" once. J.S.'s sister, ex-boyfriend, and fiancé all testified that B.M.A.J. referred to J.S. as "mommy" and talked about how he loved his "mommy."

B.M.A.J. is a "very energetic" child that requires a "lot of attention and patience." Caseworker King testified that B.M.A.J. needs a "strong parent" in his life, and did not believe

11

J.S. was capable of being a strong parent for B.M.A.J. because she has mood swings and does not show patience with B.M.A.J. CASA supervisor Lunsford testified that B.M.A.J. was placed in an assessment center due to behavioral issues for approximately ninety days. Upon his release from the assessment center, B.M.A.J. was placed in a "therapeutic" foster home where he has a "very structured" home and school environment. Lunsford testified that she did not believe J.S. could provide for B.M.A.J.'s needs because her relationship with B.M.A.J. is more akin to that of a playmate rather than a mother. J.S.'s fiancé disagreed with Lunsford's characterization of J.S.'s relationship with B.M.A.J. and described her as a "good devoted parent." W.J. described J.S.'s relationship with B.M.A.J. as "damn good."

During the pendency of the case, J.S. lived in at least two different places and never had stable employment. But by the time of trial, J.S. had obtained employment delivering phone books, earning approximately three hundred dollars per week in addition to her disability benefits that total approximately seven hundred dollars a month. J.S. testified that she had been living with her fiancé for three months by the time of trial and that, if B.M.A.J. was returned, he would have a stable home because they now live on a street with other families who have children that also have "ADHD" (attention deficit/hyperactivity disorder). J.S.'s fiancé also testified that if J.S. was given a third chance, nothing would "happen [because] there's a bunch of kids in the neighborhood where we're living at [and he will] be playing with them all day long."

Finally, J.S. accepts no responsibility for B.M.A.J.'s removal in either CPS case. J.S. testified that it was "not [her] fault" either time B.M.A.J. was removed from her care. J.S. blamed CPS's involvement in her life on her being "with the wrong man." J.S. also testified that the conditions of the house were partly due to the fact that W.J. had not "tak[en] out" the trash and litter box like he had promised.

**Conclusion**

After viewing this evidence in the light most favorable to the finding in addition to the evidence discussed in our review of the termination finding, we conclude that a reasonable trier of fact could have formed a firm belief or conviction that termination of J.S.'s parental rights was in B.M.A.J.'s best interest. *See **In re J.F.C.**, 96 S.W.3d at 266. After viewing the entire record, we conclude that the disputed evidence that J.S. had a good relationship with B.M.A.J., that his removal was "not [J.S.'s] fault," and the fact that J.S. is engaged and living on a street with other

12

families who have children with ADHD is not so significant to conclude that the fact finder's decision was unreasonable. *See id.* The evidence is legally and factually sufficient to show that termination of J.S.'s parental rights is in B.M.A.J.'s best interest.[6] Appellant's fourth issue is overruled.

Because we have held that the evidence is sufficient for termination, we need not address Appellant's fifth issue regarding the portion of the trial court's order appointing the Department sole managing conservatorship of B.M.A.J. *See* TEX. R. APP. P. 47.1.

## DISPOSITION

Having overruled A.P.'s first, third, and fourth issues, we *affirm* the judgment of the trial court.

**JAMES T. WORTHEN**
Chief Justice

Opinion delivered December 20, 2012.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*

(PUBLISH)

---

[6] J.S. cites several cases to support her contention that conduct in the distant past, unless shown to be a continuing problem is insufficient to support termination. These cases are distinguishable from the facts in the current case because J.S. had custody of B.M.A.J. for only nine months of his life and, during both periods of custody, J.S. continuously engaged in conduct that placed B.M.A.J. in endangering conditions. *See **Ray v. Burns***, 832 S.W.2d 431, 435 (Tex. App.—Waco 1992, no writ) ("Past is often prologue.").



# COURT OF APPEALS
# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS
# JUDGMENT

**DECEMBER 20, 2012**

**NO. 12-12-00225-CV**

**IN THE INTEREST OF B.M.A.J., A CHILD**

Appeal from the 294th Judicial District Court

of Van Zandt County, Texas. (Tr.Ct.No. 11-00010)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

James T. Worthen, Chief Justice.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*

# THE STATE OF TEXAS
# M A N D A T E

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**TO THE 294TH DISTRICT COURT of VAN ZANDT COUNTY, GREETING:**

Before our Court of Appeals for the 12th Court of Appeals District of Texas, on the 20th day of December, 2012, the cause upon appeal to revise or reverse your judgment between

**IN THE INTEREST OF B.M.A.J., A CHILD**

**NO. 12-12-00225-CV; Trial Court No. 11-00010**

Opinion by James T. Worthen, Chief Justice.

was determined; and therein our said Court made its order in these words:

"THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance."

**WHEREAS, WE COMMAND YOU** to observe the order of our said Court of Appeals for the Twelfth Court of Appeals District of Texas in this behalf, and in all things have it duly recognized, obeyed, and executed.

**WITNESS, THE HONORABLE JAMES T. WORTHEN**, Chief Justice of our Court of Appeals for the Twelfth Court of Appeals District, with the Seal thereof affixed, at the City of Tyler, this the _____ day of _____, 201____.

CATHY S. LUSK, CLERK

By:_____
    Deputy Clerk

15