

## Fourth Court of Appeals
### San Antonio, Texas

## MEMORANDUM OPINION

No. 04-22-00648-CV

**IN THE INTEREST OF S.R.W.**, a Child

From the 45th Judicial District Court, Bexar County, Texas
Trial Court No. 2021-PA-01236
Honorable Charles E. Montemayor, Judge Presiding

Opinion by:   Rebeca C. Martinez, Chief Justice

Sitting:   Rebeca C. Martinez, Chief Justice
Irene Rios, Justice
Beth Watkins, Justice

Delivered and Filed: March 8, 2023

AFFIRMED

This appeal arises from the trial court's order terminating the parental rights of appellants

N.W. and H.W. to their daughter, S.R.W.[1]  In three issues, N.W., S.R.W.'s biological father, argues

that the evidence is legally and factually insufficient to support the trial court's findings that: (1)

he engaged in conduct or knowingly placed S.R.W. with persons who engaged in conduct which

endangers the physical or emotional well-being of S.R.W.; (2) he failed to comply with specific

provisions of a court order; and (3) termination of his parental rights is in the best interest of S.R.W.

*See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E), (O), (b)(2).  In one issue, H.W., S.R.W.'s biological

---

[1] We refer to the child and the child's family members by their initials in accordance with the rules of appellate procedure.  *See* TEX. R. APP. P. 9.8(b)(2).

mother, argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights is in the best interest of S.R.W. We affirm.

## I. BACKGROUND

N.W. and H.W. (collectively "the parents") have been the subject of two investigations by the Texas Department of Family and Protective Services (hereinafter the "Department") regarding the welfare of S.R.W., who was born in July 2017 and is afflicted with Noonan syndrome. The first investigation began in 2018, and it evolved into a termination proceeding. However, in January 2020, that initial termination proceeding was dismissed. Approximately eighteen months later, in July 2021, the Department initiated a second investigation into the welfare of S.R.W. This second investigation culminated in the Department again filing a petition to terminate the parents' rights. Thereafter, the trial court signed a temporary order appointing the Department as S.R.W.'s temporary managing conservator, and S.R.W. was placed with a foster mother. In another temporary order, the trial court found that the parents had neither reviewed nor signed their service plans. Nevertheless, the service plans were adopted and incorporated into a court order. Ultimately, the Department proceeded to a bench trial, which began in June 2022 and concluded in September 2022, after two extended recesses. The evidence at trial focused on S.R.W.'s medical needs, the Department's concerns for her welfare, the parents' efforts to address the Department's concerns, and S.R.W.'s adjustment to her foster family.

### A.    S.R.W.'s Medical Needs

S.R.W. receives medical care from, among others, Alexandra Grace, a nurse practitioner employed by the genetics clinic at Children's Hospital of San Antonio, and Socorro Reyes, M.D., a board-certified pediatric endocrinologist.

Grace testified that S.R.W. has Noonan syndrome, which is a genetic disorder. Noonan syndrome causes hypotonia, a weakness of muscle texture that affects numerous organ systems.

As an example, Grace explained that hypotonia may affect the muscles around the eyeball, causing the eyes to drift in and out. It may also cause eye disorders such as strabismus, esotropia, and exotropia, all of which require treatment by an ophthalmologist. Other potential ailments associated with Noonan syndrome include "holes in the heart," which Grace emphasized is a muscle, and constipation caused by weak abdominal muscles.

In December 2018, Dr. Reyes met the parents, and she began treating S.R.W. for Noonan syndrome. Dr. Reyes testified that she initially evaluated S.R.W. for growth because children with Noonan syndrome tend to lag in growth rates. In such cases, growth hormone injections are prescribed. S.R.W.'s growth at the time of Dr. Reyes's initial evaluation did not necessitate growth hormone therapy. However, Dr. Reyes recommended that S.R.W. follow up with her every six months to evaluate her growth and determine if she became a growth-hormone candidate. Dr. Reyes recalled explaining to the parents the importance of following up with S.R.W.'s care.

## B.      Department's Concerns

Deitra Marquez, a Department case worker, testified about the circumstances that prompted the 2018 Department investigation and the Department's continued concern about the parents' ability to adequately care for S.R.W.'s medical needs.

### 1.      2018 Investigation and Termination Proceeding

Marquez recalled that the 2018 investigation was initiated by a referral that the parents were using drugs and neglectfully supervising S.R.W. Specifically, the Department was concerned that H.W. was under the influence of illegal substances while she was the primary caretaker of S.R.W. and that the family was homeless and living in a hotel. The Department was also concerned that S.R.W. was not growing at an adequate pace. During the 2018 investigation, H.W., according to Marquez, admitted that she did not have food or clothing for S.R.W. The 2018 investigation evolved into a termination proceeding. Over the course of the termination proceeding, the

Department offered the parents social services, including a psychological evaluation, individual therapy, parenting classes, and drug treatment. The family's housing situation stabilized when they began residing with N.W.'s mother. Additionally, S.R.W. showed improvement by gaining weight and increasing her communication skills to the point where she spoke in two-or-three-word sentences. The 2018 termination proceeding was dismissed in January 2020.

### 2. Medical Neglect and Developmental Delays

Many of the concerns that prompted the 2018 investigation reemerged in 2021. According to Marquez, a Department investigation revealed that S.R.W. had: (1) decreased in weight; (2) bruising on her arms and legs; (3) not been seen by any medical professional since approximately January 2020; and (4) regressed in communication skills to the point where she "would bark like a dog." Grace, upon reviewing S.R.W.'s medical records, testified that she had a gap in care at the genetics clinic from June 17, 2019, to December 2, 2021. Marquez attested that S.R.W. was clothed in only a t-shirt, and she was not wearing either a "pamper" or underwear on the day that the Department took custody of S.R.W. Moreover, H.W. admitted, according to Marquez, that she used methamphetamines just four days before S.R.W. was removed from the home.

Foster mother began fostering S.R.W. on July 15, 2021. Upon initially meeting S.R.W., foster mother noticed that she was "very, very small . . . very skinny", her "eyes were almost bulging from her head," she was covered in "green and purple" bruises, her hair was very sparse and thin, she was "very dirty, very stinky," and she would bite foster mother. Socially, S.R.W. would only communicate with the word "no." Foster mother recalled that S.R.W. would crawl around on the floor and bark like a dog. S.R.W.'s primary care physician prescribed speech, occupational, and play therapies.

H.W. conceded that S.R.W. has special health needs. However, she blamed the gap in S.R.W.'s medical care on health care professionals instituting a six-to-eight-month long waitlist

because of COVID. Marquez confirmed that H.W. told her S.R.W. missed medical appointments because she believed COVID protocols precluded S.R.W. from attending such appointments. Marquez, however, explained that the Department viewed follow up care for S.R.W.'s Noonan syndrome as essential, even under COVID protocols. Indeed, Marquez understood that S.R.W.'s Noonan syndrome required care from a variety of medical specialists, including endocrinologists, ophthalmologists, geneticists, and cardiologists. Dr. Reyes testified that her medical practice stopped in-person medical visits during the COVID pandemic. However, she insisted that her medical practice never closed. Instead, Dr. Reyes offered "telemedicine visits" to her patients, and she relied on parents to perform in-home height and weight measurements. Since the 2021 termination proceeding began, H.W. admitted attending only one of S.R.W.'s doctor's appointments because "[t]hat's all [she] was allowed to."

H.W. blamed S.R.W.'s bruising on her Noonan syndrome. N.W. insisted that the bruises S.R.W. exhibited when the Department took custody of her were caused by her playing in a park. He explained that the two frequently played in a park. H.W. emphasized that she has observed larger and worse bruises on S.R.W. since she was placed in foster care, pointing to three-to-four new bruises that she observed the day before the trial began.

The parents denied that S.R.W.'s communication skills had regressed. Instead, they explained that S.R.W. "is a big fan of dogs," and she enjoys mimicking her dog. As for S.R.W.'s decrease in weight, H.W. explained that she goes through "growth spirits" [sic], where "she will go a few months without — without growing at all." N.W. echoed H.W.'s explanation for S.R.W.'s weight, and he described his own experience growing up with Noonan syndrome. Specifically, N.W. recalled how he would not grow as fast as his classmates and was provided special education for some of his classes. At forty-four years old during the time of trial, N.W. described his present experience with Noonan syndrome as "like hardly anything."

N.W. acknowledged that S.R.W. could have been in better condition upon her July 2021 removal. However, he denied that, at the time of her removal, S.R.W. was very skinny, dirty, and stinky, with sparse hair, and wearing dirty clothes. N.W. explained that, on the July 2021 day that the Department took custody of S.R.W., it was laundry day and that is why she was in a baggy t-shirt. Further, if S.R.W. smelled of urine, that was because she was in the middle of potty training.

### 3.     Housing Stability

In addition to S.R.W.'s medical needs, Marquez expressed concern about the parents' ability to provide a stable and safe home for S.R.W. Regarding housing, the service plan for each parent, which the trial court admitted, provides:

> [The parent] will maintain independent housing and show proof of such housing through a lease or a deed. [The parent] will allow the Department unannounced access to the home to assess the environment. If there are any individuals in the home spending a significant amount of time, [the parent] will identify the individual so that criminal and CPS [Child Protective Services] background checks can be run.

Marquez noted that, during the 2018 investigation and termination proceeding, the parents were evicted from their apartment. At that time, the Department provided them with "referrals for housing." When the July 2021 termination petition was filed, the parents were, according to Marquez, living in a hotel. Since then, they have lived with H.W.'s mother and in a hotel. When the trial began in June 2022, the parents were renting a bedroom in the home of one of N.W.'s coworkers. Marquez visited this rented room, and she described it as "very cluttered" and noted that the parents slept on an air mattress on the floor. Marquez contended that the parents had not provided her with a lease or any other residential real estate document. Marquez expressed concern that there is inadequate space for S.R.W. Furthermore, Marquez had been unable to run background and CPS checks on the other occupants of the home because the parents have failed to provide her with their names, dates of birth, and social security numbers.

N.W. acknowledged that when S.R.W. was removed from the couple's custody, they were living in a hotel room. N.W. explained that it was difficult finding an apartment because of the wage and work history requirements many landlords maintain. H.W. admitted that a hotel was not a stable home for S.R.W. By the final days of trial, in September 2022, the parents and their newborn son resided in a one-bedroom apartment in which the living room had been "divided" into a bedroom for S.R.W. H.W. emphasized that the couple's new apartment showed that they could now provide S.R.W. with a stable home.

## C.      S.R.W.'s Condition Post-Removal

Foster mother recounted how S.R.W. has adjusted to her foster family, settled into a routine, and developed self-care skills. In addition to S.R.W., foster mother cares for a six-year-old biological child and a pair of foster siblings who were four and three years old at the time of trial. S.R.W. loves foster mother's parents. She described S.R.W. in her home as seeming "very comfortable, very happy, and very openly express[ive of] love and happiness." Foster mother described the routine that S.R.W. has settled into in her foster home. On Wednesdays, S.R.W. participates in piano lessons; on Tuesdays, she visits with her biological parents; and every evening, she falls asleep between seven and eight o'clock. As for self-care, S.R.W. now dresses herself, brushes her teeth, and uses the restroom on her own.

Foster mother testified that since she began fostering S.R.W., she has been under the care of three physicians: (1) a primary care physician; (2) a geneticist; and (3) Dr. Reyes. Foster mother has attended every one of S.R.W.'s medical appointments since becoming her foster parent. In January 2022, Dr. Reyes determined that S.R.W. would benefit from daily growth hormone injections. Foster mother has since learned how to administer these injections to S.R.W. Once growth-hormone therapy is initiated, it is, according to Dr. Reyes, "very important" that the patient receives regular follow up evaluations every four months. These follow up evaluations monitor

for rare but serious side effects, such as brain swelling. Dr. Reyes anticipated that S.R.W. would be on growth hormone therapy for another ten years.

Marquez attested to S.R.W.'s educational development since being placed with her foster family. Specifically, Marquez recounted that S.R.W. needed a lot of individualized attention and "504 accommodations" when she was initially placed with her foster family. At the time of trial, however, she was "satisfactory on pretty much all levels" and was "fully on target." She was recently advanced a grade, and the teachers in her new grade level were "fighting" because "they all want her in their class." Marquez recalled that the school district was "hoping [that] by the end of the school year", S.R.W. would not need as much individualized attention.

Jessica Moody, a CPS contractor, supervised S.R.W.'s visits with her parents since her foster-home placement. Moody recalled that the visits were appropriate and that the parents typically would bring toys, snacks, and drinks to the visits. Moody testified that S.R.W. seemed bonded with her parents. As evidence of their bond, Moody offered her observation that, at the beginning of the visits, S.R.W. would run to her parents and give them hugs. Further, Moody believed that S.R.W.'s parents seemed attentive to her needs. Before June 2022, when trial began, the parents missed a total of eight visits. Two visits were canceled because S.R.W.'s caregivers could not attend and another two were canceled because the parents contracted COVID. The remaining visits, according to Moody's records, were canceled because the parents experienced car trouble.

A Court Appointed Special Advocate volunteer ("CASA volunteer") recommended that the parents' parental rights to S.R.W. be terminated. Although the parents' visits with S.R.W. "really go along very nicely, very positive[ly]," CASA volunteer was concerned because, on two instances, S.R.W. was removed from the parents' custody because she "fail[ed] to thrive" and due to parental "neglect." CASA volunteer described that, since S.R.W. was placed with her foster

family, she had observed significant improvement over the nine visits she made with S.R.W. Specifically, CASA volunteer testified that, "[S.R.W. is] fully potty trained. She eats everything. She had gained weight. Then she knows all her ABCs, counts the numbers, knows her colors, draws. She likes to draw. She likes to read to herself and participate with other kids, too. And she's very friendly. Very, very friendly."

Marquez testified that the parents were slated to have weekly visitation with S.R.W. However, the parents' visits have averaged only about once a month. Marquez observed some of the visits with the parents. She described S.R.W. as bonded with her biological parents. However, when the visits are over, S.R.W. "doesn't cry, or get upset, or have like uncontrollable tantrums to where she can't be consoled . . . ." When S.R.W. is returned to her foster mother, Marquez described S.R.W. as "happy to see her and she walks towards [her foster mother] and walks away from the [biological] parents." Marquez also observed S.R.W. in her foster home. S.R.W. is, as Marquez recounts, "very comfortable in the [foster] home and very bonded to the foster placement." For example, S.R.W. is "comfortable asking for things," seeks her foster parents' comfort when "she is sad," and "likes to talk to them about things that she's happy about."

Marquez recounted that since the Department assumed responsibility for S.R.W.'s care, she has made "significant progress." As examples, Marquez testified that within three months, S.R.W. gained weight, spoke in full sentences, had been "successfully discharged" from occupational therapy, and was "very happy to let you know how she's feeling emotionally." S.R.W. also began attending all her medical appointments, was fully potty trained, and resumed daily growth hormone injections.

In Marquez's opinion, the parents have not demonstrated any significant improvement in their life, lifestyle, or behavior that would indicate it is safe for S.R.W. to be back in their care. Specifically, Marquez highlighted their belief that S.R.W.'s medical appointments were not

essential as "highly concerning." If S.R.W. were reunified with her parents, they do not have, according to Marquez, a childcare plan in place. On the other hand, Marquez lauded the care that S.R.W.'s foster parent has provided her, testifying:

> I believe her medical care of [S.R.W.] is of the most importance, and maintaining that care, and the fact that she's been able to thrive within her speech, and OC services, and gaining weight, and growing on the Noonan's curve, I think that that says a lot about the care that she's receiving at this time.

Foster mother is willing to continue caring for S.R.W. should the parents' rights be terminated. According to foster mother, S.R.W. told her that foster mother's home "is her home." As the two drive to S.R.W.'s Tuesday visits with the parents, she makes foster mother assure her that "she's coming home" and that foster mother "will not leave while she's there."

For the parents' part, N.W. admitted that at the time of trial he lacked the skills that were necessary to care for S.R.W.'s Noonan syndrome. He insisted, however, that he was willing to learn. N.W. planned on doing what the doctors recommend, including receiving training on S.R.W.'s growth hormone injections. Over the twelve months before trial, H.W. had submitted to multiple drug tests, including two urine analysis, two hair follicle and two nail tests, and a mouth swab. All of these tests resulted in negative results.

## D.     Disposition

At trial's conclusion, the trial court found by clear and convincing evidence that both parents had "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child," failed to comply with specific provisions of a court order, and that termination of their parental rights was in S.R.W.'s best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E), (O), (b)(2). The trial court signed a final judgment terminating the parental rights of appellants N.W. and H.W. Both parents appealed from the termination order.

**II. DISCUSSION**

**A.     Standard of Review**

A parent-child relationship may be terminated, pursuant to section 161.001 of the Texas Family Code, only if the trial court finds by clear and convincing evidence one of the predicate grounds enumerated in subsection (b)(1) and that termination is in a child's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(1), (2). Clear and convincing evidence requires "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id*. § 101.007.

We review the legal and factual sufficiency of the evidence under the standards of review established by the Texas Supreme Court in *In re J.F.C.*, 96 S.W.3d 256, 266–67 (Tex. 2002). In reviewing the legal sufficiency of the evidence, we must "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *Id*. at 266. "[A] reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *Id*. In reviewing the factual sufficiency of the evidence, we "must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *Id*. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id*.

**B.     Applicable Law:  Endangerment Under Subsection E**

Section 161.001(b)(1)(E) allows a trial court to terminate a parent's rights if the court finds by clear and convincing evidence that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(E). Under Subsection (E), the trial court

must determine whether there is evidence that a parent's acts, omissions, or failures to act endangered the child's physical or emotional well-being. *See In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.).

Our analysis under Subsection (E) is guided by, among other things, three basic rules. First, "endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or mental health. *Id.*; *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam). Second, our analysis may not rest on a single act or omission; it must be "a voluntary, deliberate, and conscious course of conduct." *Jordan v. Dossey*, 325 S.W.3d 700, 723 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). Third, we may consider parental conduct that did not occur in the child's presence, including conduct before the child's birth or after the child was removed from a parent's care. *In re I.I.T.*, 648 S.W.3d 467, 475 (Tex. App.—San Antonio 2021, no pet).

## C.  Analysis:  Endangerment Under Subsection E

In N.W.'s first issue, he argues that the evidence is legally and factually insufficient to support the trial court's finding that he engaged in conduct or knowingly placed S.R.W. with persons who engaged in conduct which endangers the physical or emotional well-being of S.R.W. Neglect of a child's medical needs endangers a child. *See In re P.E.W.*, 105 S.W.3d 771, 777 (Tex. App.—Amarillo 2003, no pet.). In this case, the trial court heard ample evidence regarding S.R.W.'s heightened need for continued medical care in light of her Noonan syndrome and the parents' failure to provide for those needs in the 2018 and 2021 termination proceedings.

Grace and Dr. Reyes explained the importance of follow up care for children afflicted with Noonan syndrome because of its deleterious effect on a child's growth. As an example, Grace emphasized that Noonan syndrome may cause "holes in the heart." Despite this need, the record supports a finding that the parents failed to provide S.R.W. with any medical care between the end of the 2018 termination proceeding and the initiation of the 2021 termination. Grace testified that

S.R.W. had not received care from the genetics clinic for almost two and a half years, from June 17, 2019, to December 2, 2021. Marquez testified similarly, noting that the parents had not provided S.R.W. with *any* medical care since approximately January 2020. The record also includes evidence of the effects of S.R.W. going without, among other things, medical attention. Foster mother noticed that when she first began caring for S.R.W., she was "very, very small . . . very skinny," her "eyes were almost bulging from her head," she was covered in "green and purple" bruises, her hair was very sparse and thin, she was "very dirty, very stinky," and she would bite foster mother. The trial court also may have found that N.W. was aware of S.R.W.'s medical needs because, according to Marquez, the Department initiated the 2018 termination proceeding, in part, out of concern that S.R.W. was not growing at an adequate pace.

There was also evidence that S.R.W.'s medical needs continued to be pronounced. Once growth-hormone therapy is initiated, it is, according to Dr. Reyes, "very important" that the patient receives regular follow up evaluations every four months. These follow up evaluations monitor for rare but serious side effects, such as brain swelling. Dr. Reyes anticipated that S.R.W. would be on growth hormone therapy for another ten years. In light of N.W.'s past inattention to S.R.W.'s medical needs, the trial court may have found that he would not be able to attend to S.R.W.'s current and future medical needs, including her growth hormone injections and attendant monitoring.

Viewing all the evidence in the light most favorable to the trial court's judgment, we conclude a reasonable factfinder could have formed a firm belief or conviction that N.W. "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(E). Thus, the evidence is legally sufficient to support this finding. Further, after considering the entire record, including any disputed or contrary evidence, we conclude the evidence is factually

sufficient to support the trial court's termination under Subsection 161.001(b)(1)(E) of the Texas Family Code. N.W.'s first issue is overruled.[2]

## D.    Applicable Law:  Best Interest

It is the burden of the party seeking termination to establish that termination is in the child's best interest. *See In re J.F.C.*, 96 S.W.3d at 266. In a best interest analysis, we apply the non-exhaustive *Holley* factors. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).[3] The set of factors is not exhaustive, and no single factor is necessarily dispositive of the issue. *Id*. at 372; *In re A.B.*, 269 S.W.3d 120, 126 (Tex. App.—El Paso 2008, no pet.).

We recognize there is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). However, promptly and permanently placing a child in a safe environment is also presumed to be in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a). Thus, we also consider the factors set forth in section 263.307(b) of the Family Code. *Id*. § 263.307(b). Additionally, evidence that proves one or more statutory grounds for termination may be probative of a child's best interest, but it does not relieve the State of its burden to prove best interest. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

In conducting a best interest analysis, we consider direct evidence, circumstantial evidence, subjective factors, and the totality of the evidence. *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). Additionally, a factfinder may measure a parent's future conduct

---

[2] Because there is sufficient evidence of subsection E endangerment, we need not address N.W.'s second issue, challenging the sufficiency of the evidence to support the trial court's findings that N.W. committed the predicate act listed in subsection 161.001(b)(1)(O). *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) ("Only one predicate finding under section 161.001[(b)](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest.").

[3] These factors include: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist the individuals seeking custody to promote the child's best interest; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions which may indicate that the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *See Holley*, 544 S.W.2d at 371–72.

by her past conduct in determining whether termination of parental rights is in the child's best interest. *Id*. In analyzing the evidence within the *Holley* framework, evidence of each *Holley* factor is not required before a court may find that termination is in a child's best interest. *C.H.*, 89 S.W.3d at 27. Moreover, in conducting our review of a trial court's best interest determination, we focus on whether termination is in the best interest of the child, not the best interest of the parent. *In re D.M.*, 452 S.W.3d 462, 470 (Tex. App.—San Antonio 2014, no pet.).

### E. Analysis: Best Interest

#### 1. *Desire of the Child*

Moody and Marquez testified that S.R.W., who was five years old at the time of trial, seems bonded to N.W. and H.W. During supervised visits, Moody observed S.R.W. run to her parents and hug them. CASA volunteer found S.R.W.'s visits with her parents to be "positive." Marquez also observed S.R.W.'s bond with foster mother. Indeed, Marquez recounted that when visits with N.W. and H.W. are over, S.R.W. "doesn't cry, or get upset, or have like uncontrollable tantrums to where she can't be consoled . . . ." Upon S.R.W.'s return to foster mother, Marquez described S.R.W. as "happy to see her and she walks towards [her foster mother] and walks away from the [biological] parents." Marquez's recollection dovetails with foster mother's testimony that S.R.W. told foster mother her foster home "is her home." On drives after S.R.W.'s visits with her parents, S.R.W. would ask foster mother to assure her that "she's coming home" and that foster mother "will not leave while she's there." S.R.W. is, as Marquez recounts, "very comfortable in the [foster] home and very bonded to the foster placement." For example, S.R.W. is "comfortable asking for things," seeks her foster parents' comfort when "she is sad," and "likes to talk to them about things that she's happy about." In light of this evidence, the desires of the child (the first *Holley* factor) weighs in favor of termination regarding N.W. and H.W.

**2.** *Emotional and Physical Needs/Danger and Parental Abilities*

Children's basic needs include medical care. *See In re K-A.B.M.*, 551 S.W.3d 275, 288 (Tex. App.—El Paso 2018, no pet.); *In re P.S.*, No. 02-16-00458-CV, 2017 WL 1173845, at *9 (Tex. App.—Fort Worth Mar. 30, 2017, no pet.) (mem. op.). In deciding that termination of parental rights is in the best interest of a child, the trier of fact may consider evidence that a parent neglected to seek appropriate medical treatment for the child. *See In re J.R.W.*, No. 14-12-00850-CV, 2013 WL 507325, at *9 (Tex. App.—Houston [14th Dist.] Feb. 12, 2013, pet. denied) (mem. op.); *see also* TEX. FAM. CODE ANN. § 263.307(b)(12)(A), (F) (in determining whether parent is willing and able to provide a child with a safe environment, factfinder may consider whether parent demonstrates adequate parenting skills including providing health care and understanding child's needs). Likewise, the trier of fact may infer from a parent's past inattention to her children's medical needs that such inattention will continue in the future. *See In re L.G.R.*, 498 S.W.3d 195, 205–06 (Tex. App.—Houston [14th Dist.] 2016, pet. denied); *In re J.R.W.*, 2013 WL 507325, at *9; *see also In re B.K.D.*, 131 S.W.3d 10, 17 (Tex. App.—Fort Worth 2003, pet denied) (fact finder may infer that past conduct endangering child's well-being may recur in the future if child is returned to parent).

S.R.W.'s Noonan syndrome requires vigilant follow up care, according to Marquez, Grace, and Dr. Reyes. Marquez understood that S.R.W.'s Noonan syndrome required care from a variety of medical specialists, including endocrinologists, ophthalmologists, geneticists, and cardiologists. Grace explained that Noonan syndrome afflicts a variety of muscle tissue, including the heart. In Grace's professional estimation, it may even lead to "holes in the heart." Dr. Reyes explained the need for follow up care to N.W. and H.W. because of the deleterious effects on growth and development associated with Noonan syndrome.

Notwithstanding the advice Dr. Reyes conveyed to N.W. and H.W., Marquez testified that S.R.W. did not receive any medical care in all of 2020. Grace similarly testified, noting that S.R.W. had not been evaluated at the genetics clinic from June 17, 2019, to December 2, 2021. When foster mother began fostering S.R.W., she attested that S.R.W. was "very, very small . . . very skinny," her "eyes were almost bulging from her head," and her hair was very sparse and thin. By the time foster mother began providing S.R.W. with foster care, she qualified for daily growth hormone injections. *See Spurk v. Tex. Dep't of Fam. & Protective Servs.*, 396 S.W.3d 205, 222–24 (Tex. App.—Austin 2013, no pet.) (considering parent's delay in seeking medical treatment in holding evidence sufficient to support finding that termination was in child's best interest).

The parents' testimony that they could not secure medical care for S.R.W. during the COVID pandemic is contradicted by Dr. Reyes's insistence that she continued to provide "telemedicine" evaluations during the pandemic. Similarly, the factfinder may have discounted N.W.'s insistence that he was willing to learn how to administrator S.R.W.'s daily growth hormone injection in light of his failure to ensure adequate follow up medical care. *See In re B.K.D.*, 131 S.W.3d at 17; *see also In re E.D.*, 419 S.W.3d at 620 (trial court may measure parent's future conduct by past conduct).

In light of this evidence, S.R.W.'s present and future emotional and physical needs, any present or future emotional and physical danger to S.R.W., and the parental abilities of the individuals seeking custody (the second, third, and fourth *Holley* factors) weigh strongly in favor of termination regarding N.W. and H.W.

### 3. *Stability of the Home*

Marquez reported that, when the July 2021 termination proceeding began, the family was living in a hotel. Since then, the parents have lived with H.W.'s mother, in a hotel, and a bedroom the couple rented in the home of one of N.W.'s coworkers. Marquez expressed concern over the

rented bedroom because it was "very cluttered" and provided inadequate space for S.R.W. According to the parents, in between the initial and final days of trial, they had rented a one-bedroom apartment and divided a space in the living room to provide S.R.W. with a bedroom. N.W. and H.W.'s ability to provide a stable home for S.R.W. also prompted the 2018 termination proceeding. Since being placed with foster mother, S.R.W. has adjusted to her foster family. Foster mother detailed how S.R.W. loves her foster grandparents, is "very comfortable, very happy, and very openly express[ive of] love and happiness," has a routine that includes piano lessons, visits with her biological parents, and has a set bedtime. Foster mother also detailed how S.R.W. has learned self-care skills such as dressing herself, brushing her teeth, and using the restroom on her own. Moreover, foster mother is willing to continue caring for S.R.W. should N.W. and H.W.'s parental rights be terminated.

N.W. and H.W.'s rotating homes and foster mother's willingness to be a long-term placement for S.R.W. implicate the seventh *Holley* factor — the stability of the home or proposed placement. *See Holley*, 544 S.W.2d at 371–72 (listing the stability of the home as a best-interest factor); *In re G.V.*, No. 14-02-00604-CV, 2003 WL 21230176, at *5 (Tex. App.—Houston [14th Dist.] May 29, 2003, pet. denied) (mem. op.) (noting the stability that a proposed placement promises "weigh[s] heavily in the court's finding that termination is in the best interest" of a child). The stability of the home or proposed placement (the seventh factor), weighs strongly in favor of termination regarding N.W. and H.W.

## C. Disposition: Best Interest

The facts in this case yield that the first, second, third, fourth, and seventh *Holley* factors weigh in favor of terminating N.W.'s and H.W.'s parental rights to S.R.W. Accordingly, after viewing all of the evidence in the light most favorable to the best-interest finding, we conclude that the trial court could have formed a firm belief or conviction that termination of N.W.'s and

H.W.'s parental rights was in S.R.W.'s best interest. *See In re J.F.C.*, 96 S.W.3d at 266. We further conclude that any disputed evidence, viewed in light of the entire record, could have been reconciled in favor of the trial court's best-interest finding or was not so significant that the trial court could not have reasonably formed a firm belief or conviction that termination was in the child's best interest. *See id.* Therefore, we hold the evidence is legally and factually sufficient to support the trial court's best-interest finding. *See* TEX. FAM. CODE ANN. § 161.001(b)(2); *see also In re A.B.*, 437 S.W.3d 498, 505 (Tex. 2014) (recognizing an appellate court need not detail the evidence if affirming a termination judgment). N.W.'s third issue and H.W.'s sole issue are overruled.

### III. CONCLUSION

We affirm the trial court's parental termination order.

Rebeca C. Martinez, Chief Justice